**C.W. JACKSON, Defendant/Third-Party Plaintiff-Appellant,**

v.

**George E. RUSSELL, Plaintiff-Appellee,**

**and**

**PPG Industries, Inc., Third-Party Defendant-Appellee.**

No. 1–385A63.

Court of Appeals of Indiana, First District.

Oct. 1, 1986.
Rehearing Denied Nov. 21, 1986.

Robert J. DuComb, Jr., Sacks, Tierney & Kasen, P.A., Phoenix, Ariz., Stephen F. Burns, Burns & Clark, Indianapolis, for defendant/third-party plaintiff-appellant.

Robert F. Zoccola, Alan S. Brown, Locke, Reynolds, Boyd & Weisell, Indianapolis, Thomas A. Whitsitt, Giddings, Whitsitt, Baker & McClure, Lebanon, for George E. Russell.

Allen F. Wharry, Martin & Wharry, Lebanon, Charles W. Kenrick, Stephen C. Kifer, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for PPG Industries, Inc.

RATLIFF, Judge.

## STATEMENT OF THE CASE

C.W. Jackson appeals a jury verdict against him for breach of duty in a joint venture, tortious interference with a contract, constructive fraud, and criminal mischief. In addition, Jackson appeals the trial court's failure to declare a mistrial following the disqualification of his lead counsel. We affirm.

## FACTS

In 1970, George E. Russell became president of Como Plastics Corporation (Como) in Columbus, Indiana, upon his father's death. Como, a family owned and operated business, manufactured plastic injection molded products. In 1972, Russell accepted an offer to sell Como to PPG Industries, Inc. (PPG) of Pittsburgh, Pennsylvania. The company would be operated in Columbus as a wholly-owned subsidiary of PPG, with Russell serving as its president and chief operating officer. In 1975, PPG merged Como with two other companies forming a new division to be known as the Plastic Fabrication Division (PFD) and appointed Russell vice-president and general manager of the division.

In 1979, Russell learned of a decision by PPG to sell the PFD. Feeling that division losses were largely the result of developmental programs focused on other divisions, Russell believed reorganization of the PFD would produce enormous potential for success. Russell also felt a western facility was necessary, and to that end travelled to Phoenix, Arizona.

While in Phoenix, Russell met C.W. Jackson and explained his plans to purchase the PFD. Russell gave Jackson a copy of his confidential business plan for his proposed new business, Polycorp, Incorporated (Polycorp). On June 23, 1980, F.B. O'Neil, vice-president of corporate development for PPG, terminated negotiations with Russell

effective June 30, 1980, and informed Russell that PPG intended to cease operations at PFD and liquidate it. Meanwhile, through a series of phone calls, Jackson and Russell discussed financing for the purchase of the PFD. Jackson visited the PFD plant in Columbus, Indiana.

On July 20, 1980, Jackson proposed to Russell, by telephone, that they enter into a joint venture to acquire the PFD. According to their plan, Russell would negotiate the purchase of the PFD for $6.5 million and Jackson would provide the financing. A corporation would be formed to operate the business with Russell as chief officer, with Russell owning two-thirds (2/3) and Jackson owning one-third (1/3). The two men would form a partnership to own the real estate on an equal basis, with Jackson managing the partnership.

Russell and his attorney, Stephen Dutton, met with Jackson and his attorney Robert Kassing, of Bose, McKinney, and Evans (Bose) on July 23, 1980, and the terms of the agreement were confirmed orally. The parties also discussed control of the corporation in the event of default and a potential buy-sell arrangement. Jackson made an alternate buy-sell suggestion that Russell felt was economically unfair and so the parties used the original corporation and partnership divisions.

On August 19, 1980, Russell executed a Letter of Intent prepared by Dutton which Jackson executed the following day. This letter reiterated, outlined, and enunciated the prior oral understandings · between Jackson and Russell, generally serving as a "roadmap" to the agreement. Earlier, on August 15, 1980, PPG and Russell had entered into a Restated Agreement for acquisition of the PFD with closing set for September 30, 1980. After the parties executed the Letter of Intent, Russell forewent all other financing.

From July 24, 1980, through September 24, 1980, attorneys for Jackson and Russell discussed and negotiated preparation of the documents necessary to complete the transaction. On September 24, 1980, the attorneys met to examine the documents and

Dutton again rejected Kassing's alternate proposal for pricing the buy-sell agreement. On the day the documents were to be exchanged, September 26, 1980, Bose was not finished with their share of the work and so Russell's attorney completed all the documents. Meanwhile, on September 17, 1980, Dutton had executed Polycorp's Articles of Incorporation with Russell as sole shareholder and director. Also, during September Russell had appeared before the economic development commissions in Columbus, Indiana, and Newton, North Carolina, to present his plan in hopes of obtaining financing through use of industrial revenue bonds.

Closing was scheduled for September 30, 1980. Prior to this, Dutton, Kassing, David Wills, another Bose attorney, Jackson and others met at the Bose offices to review documents. Only two or three of the ten to twelve documents were in final form. Negotiations reached an impasse when Jackson's attorneys again insisted on an alternative buy-sell agreement. Viewing this as an attempt to alter the deal, Dutton left telling Kassing and Jackson he would have to discuss the problem with Russell. Shortly thereafter, Jackson telephoned Russell at Dutton's office and informed Russell that he was quitting the deal.

Jackson then summoned Thomas Butera (Butera), an attorney for PPG who was attending a meeting there, into his office and informed him that the deal with Russell was "off" and that he was interested in purchasing the PFD for himself. Butera advised Jackson that no one from PPG's Indianapolis division had authority to accept such a proposal. Butera left and reported Jackson's proposal to his superiors. Thereafter, Jackson telephoned Dutton's office and told H. Kennedy Linge, PPG's attorney in charge of the sale, that he wanted to purchase the PFD himself. Linge advised Jackson that since Russell had brought Jackson into the deal, PPG would not deal with Jackson.

Part of the assets of the PFD to be acquired by Polycorp was Ideal Mold.

PPG was interested in this being sold immediately and Russell needed the estimated $572,000 which the sale would generate for Polycorp. Hence, Russell assigned the right to sell Ideal Mold to PPG. As consideration for this assignment, PPG agreed: that it would not sell the PFD to Jackson; that it would sell the PFD to Russell on the same terms if he obtained financing and would credit the sale of Ideal Mold to the purchase price; and that Russell and PPG would keep each other mutually informed of their efforts. Ideal Mold was sold on October 1, 1980, while Russell renewed his efforts to obtain financing for the purchase of the remainder of the PFD.

Upon returning to Phoenix, Jackson telephoned the president of PPG and again expressed his desire to purchase the PFD. Linge and another PPG representative met with Jackson and Kassing in Phoenix and reached a tentative agreement with terms virtually identical to those previously negotiated by Russell. When PPG advised Jackson that it would not sell to him unless he provided PPG with protection against possible legal action by Russell, Jackson agreed to indemnify PPG. Jackson, in turn, requested assurance from PPG that it had no obligation to sell the PFD to Russell.

Russell learned of PPG's dealings with Jackson and protested to PPG and Jackson, believing he still possessed rights under the Restated Agreement to buy the PFD. Russell proceeded with his financing efforts, meeting with potential financiers and with PPG representatives in Pittsburgh. However, while the potential financiers indicated that the possibility of obtaining financing was promising they were not ready to set a closing date.

Meanwhile, PPG approved the sale of the PFD to Jackson because he had the money and could close the deal promptly. The sale agreement was virtually identical to the previous one between PPG and Russell. On October 20, 1980, PPG notified Russell of the sale to Jackson and terminated Russell's employment according to his desire in the event the PFD was sold.

Closing did not occur as scheduled because Jackson reneged on his promise to indemnify PPG against action by Russell. Instead, Jackson demanded indemnity from PPG. Jackson finally agreed to drop his indemnity demand when PPG agreed to reduce the purchase price by $100,000.00. The sale then closed about November 7, 1980. The financing changed only in that Russell's name was removed from the loan and guarantees and Jackson's name was substituted for Polycorp's in the industrial revenue bond applications.

After October 20, 1980, PPG approached Russell asking him to give up his claim against PPG. An agreement was negotiated whereby Russell relinquished his claim against PPG and agreed not to pursue action which would block the sale to Jackson. This agreement reserved Russell's right to sue Jackson for monetary damages. Russell received $120,000.00 as consideration, representing $25,000 from his pension fund and $95,000.00 which he paid to others for expenses and fees incurred in his efforts to acquire the PFD.

In 1981, Russell filed this civil action for damages. Russell alleged Jackson was guilty of tortious interference with contract relations, constructive fraud, breach of a fiduciary duty to a coventurer, breach of the criminal mischief statute, conspiracy, breach of contract, theft, and conversion; Russell also sought to recover on a theory of promissory estoppel. Jackson filed a third-party claim against PPG for breach of warranty.

Following the first week of the jury trial, the trial court disqualified Bose, Jackson's lead counsel, because some members of the firm would be called as witnesses. While PPG had filed a motion to disqualify Bose in March of 1984, Bose resisted on the grounds that the decision to call Kassing and Wills as witnesses had not yet been made and that it was doubtful they would be called. However, after hearing the testimony of Russell and Dutton, who was not serving as Russell's trial counsel, Peter Obremskey, Jackson's local counsel, decided it would be necessary for Kassing and

Wills to testify. Feeling that it would be an ethical violation of DR 5–102 for Kassing and Wills to serve as both counsel and witnesses, Obremskey convinced Bose that they should disqualify themselves. After lengthy discussion, the trial court accepted Bose's plan whereby Obremskey acted as lead trial counsel while Bose, now disqualified, assisted silently at the counsel table.

After a four week trial, the jury found that Jackson had not breached any contract with Russell but had tortiously interfered with Russell's contract with PPG. In addition, the jury found Jackson guilty of constructive fraud, breaching his fiduciary duty as coventurer to Russell, and violating the criminal mischief statute. The jury awarded Russell $1,255,000.00 for his claims of tortious interference, constructive fraud, and breach of a fiduciary duty, and $745,000.00 for Jackson's criminal mischief. The jury found for PPG on Jackson's third-party complaint. Russell's claim based on promissory estoppel was dismissed by the trial court pursuant to a Trial Rule 50 motion at the completion of Jackson's evidence. Thereafter, Jackson perfected this appeal.

## ISSUES

Jackson presents the following issues for review:

1. Whether Jackson's right to a fair trial was impaired because the trial court did not declare a mistrial after his lead counsel was disqualified.

2. Whether the verdict on joint venture was improper.

3. Whether there was sufficient evidence to support a verdict for tortious interference with a contract.

4. Whether PPG breached any warranties to Jackson regarding the existence of other contracts for the purchase of the PFD and whether the jury's verdict was inconsistent with its decision regarding tortious interference.

5. Whether the verdict for constructive fraud was erroneous.

6. Whether the trial court erred in refusing to admit Jackson's trial exhibit number 237.

7. Whether the trial court erred in admitting John Crane's testimony.

8. Whether the trial court erred in modifying Jackson's tendered instruction number five.

9. Whether there was sufficient evidence to support the verdict for criminal mischief.

10. Whether the jury was properly informed of the theories remaining for its consideration.

11. Whether the trial court erred in adding together the punitive damages award and compensatory damages award.

In addition, Russell cross appeals:

12. Whether the trial court erred in granting Jackson's Trial Rule 50 motion regarding Russell's claim for promissory estoppel.

## DISCUSSION AND DECISION

*Issue One*

Jackson argues his right to a fair trial was impaired by the failure of the trial court to declare a mistrial after Bose, McKinney, and Evans was disqualified as his lead counsel. Over the weekend, following the first week of trial, Obremskey realized, after having heard the testimony of Russell and Dutton, that Kassing and Wills would have to testify. Fearing he would be implicated in an ethical violation of DR 5–102(A) which prohibits an attorney from serving as both counsel and witness in a trial, Obremskey contacted Evans, a partner of Bose, to discuss his apprehension about continuing in this manner. After much discussion, Evans persuaded Obremskey to serve as lead counsel when the trial resumed, with the Bose attorneys assisting silently at the counsel table. This plan was ultimately accepted by the trial court after Bose was disqualified. Jackson argues this resulted in his receiving an unfair trial because Obremskey was not familiar with his case to the extent the

Bose attorneys were. Jackson also argues the sudden appearance of Obremskey as lead counsel with Kassing and Wills sitting silently prejudiced his case in the jurors' minds. Jackson further asserts that Bose failed to advise him of this conflict until moments before entering court when the trial resumed. Jackson argues both Bose and opposing counsel erred in not informing him of the potential ethical problem. In addition, Jackson feels the trial court ignored its duty to raise the question *sua sponte*. Therefore, Jackson argues he was prejudiced and the trial court erred in not declaring a mistrial.

At the heart of this issue are the ethical considerations present when an attorney serves both as advocate and witness in a case. Disciplinary Rule 5–102(A) of the Code of Professional Responsibility (DR 5–102(A)) provides:

> "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4)." [1]

Hence, DR 5–102(A) recognizes the potential conflict of interest: an attorney anxious to participate in litigation may fail to step aside as counsel even though his or her testimony could aid the client or fail to step aside and testify because the client strongly desires his or her continued representation.

Strong policies underlie DR 5–102(A). The rule serves to protect the plaintiff's interests, the adverse party's interests, and the reputation of the legal profession generally. *MacArthur v. Bank of New York* (S.D.N.Y.1981), 524 F.Supp. 1205, 1208. These concerns are best expressed in Ethical Consideration 5–9 (EC 5–9):

> "Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."

As DR 5–102(A) and EC 5–9 demonstrate, the Code of Professional Responsibility (CPR) seeks to arrest such conflicts by keeping separate the roles of attorney and witness.

As EC 5–9 points out, DR 5–102(A) also protects the interests of the adverse party. Jurors may accord a testifying attorney's argument undue weight because they view the attorney as possessing special knowledge of the case. *MacArthur*, at 1208. Also, for reasons of professional courtesy and court etiquette, an adverse party's attorney may be hampered in challenging the testimony of another lawyer. "Finally, the bar is ill-served when an attorney's veraci-

---

1. DR 5–101(B) provides:
"A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
 (1) If the testimony will relate solely to an uncontested matter.
 (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
 (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
 (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

ty becomes an issue in a case; lay observers especially might speculate whether counsel has compromised his integrity on the stand in order to prevail in the litigation." *Id., citing International Electronics Corp. v. Flanzer* (2d Cir.1975), 527 F.2d 1288, 1294; *United States ex rel. Sheldon Electric Co. v. Blackhawk Heating & Plumbing Co.* (S.D.N.Y.1976), 423 F.Supp. 486, 489; 6 J. Wigmore, *Evidence* § 1911 (Chadbourn rev. ed. 1976). Hence, DR 5–102(A) operates to protect the interests of both parties involved as well as the legal profession as a whole.

■ DR 5–102(A) applies when a lawyer "ought to be called as a witness on behalf of his client." It does not matter whether or not the attorney actually testifies. What is important is that he or she ought to testify. *MacArthur,* at 1208. Accordingly, the test is whether the attorney's testimony could be significantly useful to the client; if so, he or she ought to be called.

In addition, the stricture of 5–102(A) is mandatory. A party is not free to choose between an attorney's testimony or representation. Instead, the rule favors testimony: "Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." EC 5–10. While a party can be represented by other attorneys, he cannot obtain substitute testimony for an attorney's personal, relevant knowledge. *Id.,* at 1209. Therefore in deciding whether an attorney should be disqualified, courts usually balance the interests underlying DR 5–102(A) against the potential damage to the client. *MacArthur,* at 1209.

■ Absent extreme hardship to the client, DR 5–102(A) is usually strictly invoked. Hardship alone is insufficient to permit continued representation although deprivation to the client is usually the greatest precisely when the attorney is most intimately involved in the events giving rise to the suit. *Id.,* at 1210. The hardship exception covered by subparagraph (4) of DR 5–101(B) (*supra,* note 1) involves a situation where a lawyer-client team comes unexpectedly upon a possible disqualification which they did not nor could not safeguard against. *General Mill Supply Co. v. S.C.A. Services, Inc.* (6th Cir.1982), 697 F.2d 704, 713. The hardship exception is not meant for a case where a possible disqualification was visible early on, but "the parties went right on increasing the helpless dependence of client upon lawyer." *General Mill,* at 713. Instead, the duty to withdraw from representation is clearest when the need to be a witness is well known in advance. *Id.,* at 714. Therefore, absent "the distinctive value" of an attorney or his firm as counsel in a particular case, hardship alone will not be enough to prevent disqualification of an attorney where there is a conflict between acting as counsel or as a witness.[2] Therefore, the trial court acted correctly in disqualifying Bose as Jackson's lead counsel.

■ However, for the reasons noted above, Jackson argues that the trial court erred in failing to declare a mistrial following the disqualification of Bose. It should be noted that Jackson did not request or move for a mistrial at the time of the disqualification. Ordinarily, the mere ineffective assistance of counsel is not grounds for reversal or a new trial in a civil context.

**2.** "The exception expressly qualifies the hardship that must be shown to permit continued representation as one that arises 'because of the distinctive value of the lawyer or his firm as counsel in the particular case.'" *MacArthur,* at 1210. An example would be where an attorney acquired unique expertise in a highly technical area where matters are in dispute, and no substitute counsel could adequately represent the client. Another example might be a long-standing professional relationship between an attorney and client whereby the attorney has ac-

quired extraordinary and irreplaceable familiarity with the client's affairs. *Id.,* at 1211; *Indiana-Kentucky Electric Corp. v. Green* (1985), Ind.App., 476 N.E.2d 141, 148–49, *trans. denied.* In such instances, weighing the distinctive value of the attorney against the significance of his testimony might warrant invocation of the exception. However, these instances are rare. Consequently, where an attorney chooses to become intimately involved in a client's business, he must be prepared to step aside if those matters result in litigation.

*Johnson v. Rutoskey* (1984), Ind.App., 472 N.E.2d 620, 623; *In re Marriage of Ford* (1984), Ind.App., 470 N.E.2d 357, 360–61, *trans. denied.* Instead, ineffective assistance of counsel which results in the denial of a fair trial is usually asserted only in criminal cases where a defendant has a right to counsel under the Sixth and Fourteenth Amendments. *Johnson,* at 623. Moreover, in the present case a mistrial is not warranted. While we agree that a violation of the CPR that prevents a fair trial would constitute reversible error, we do not think Jackson was denied a fair trial.

Jackson asserts that Bose prejudiced his cause by failing to inform him of the potential ethical problem and need for a change of counsel until moments before the trial resumed, thereby forcing him to make a less than reasoned decision. While we do not condone Bose's actions in this case, we understand the predicament in which they placed themselves. Due to their intricate involvement in Jackson's business affairs and the matters underlying this action, Bose should have realized the need to step down as trial counsel in this matter. However, it is this heavy involvement and their eagerness to continue representing their client which apparently blinded them from realizing that Kassing and Wills would have to be called as witnesses for Jackson.

However, Jackson was not ignorant of the possible conflict as demonstrated by an exchange which took place during the disqualification discussion:

"MR. EVANS: Mr. Jackson, I just asked whether you had considered the question whether the withdrawal of your law firm would cause you a substantial hardship in this litigation. And in view of the fact that Mr. Kassing might be a witness.

"MR. JACKSON: We had a discussion of that early on, and I felt it was going to be enormously difficult for me. Two reasons. The only firm I have used for a number of years is Bose/McKinney, and it was going to be an enormous duplication of expense. I have been advised where we were on this and have felt comfortable with it in informal discussions with Kassing and yourself."

Record at 2566–67. Moreover, Jackson was an astute businessman with vast prior experience with the legal system. In *Weenig v. Wood* (1976), 169 Ind.App. 413, 349 N.E.2d 235, *trans. denied,* the defendant argued he was denied a fair trial when his local counsel was disqualified under DR 5–102(A) during trial and his defense was left to his Utah attorney. Relying on the defendant's background, this court stated:

"[W]e cannot ignore Weenig's claimed status as an experienced and travelled businessman undoubtedly not wholly ignorant of the workings of our legal system. We therefore do not perceive the interests of justice and fair play in this case to require us to vary the general rule that the inadequacy of the attorney is the inadequacy of the client. *See Moe v. Koe* (2d Dist.1975) [165] Ind.App. [98], 330 N.E.2d 761, 765."

*Weenig,* at 426, 349 N.E.2d at 243. Given Jackson's business acumen and the testimony above it is apparent Jackson was not forced into a rash decision. While we do not approve of Bose's actions we do not feel Jackson was prejudiced in this instance.

■ Furthermore, Jackson waived his right to contest the procedure adopted by the trial court. This is evidenced by the following exchanges which took place during the disqualification discussion:

"The Court: Mr. Obremskey, do you have anything you want to add to the record?

"Mr. Obremskey: Only, Your Honor, that this matter has been discussed with Mr. Jackson, who is present here in court today, and it is my understanding, is it not, Mr. Jackson, that you agree that Mr. Evans is to step down in the active defense of this matter and I am to assume principal responsibility with regard to going forward with this case?

"Mr. Jackson: Yes.

"Mr. Obremskey: That is agreeable with you?

"Mr. Jackson: Yes.

"Mr. Obremskey: All ramifications of that have been discussed with you, have they not?

"Mr. Jackson: Yes.

"Mr. Obremskey: And they meet with your approval?

"Mr. Jackson: Yes."

Record at 2555–56.

"Mr. Obremskey: Were we on the record before that picked up my previous conversation with Mr. Jackson?

"You are comfortable with me going forward, Mr. Jackson?

"Mr. Jackson: Sure."

Record at 2567.

"Mr. Obremskey: I want to get Mr. Jackson's assurance that that is agreeable with him. Do you understand what's transpired, Mr. Jackson?

"Mr. Jackson: I understand. It's satisfactory."

Record at 2584. Further evidence of Jackson's acceptance of the procedure is evidenced by Obremskey's affidavit submitted in support of Jackson's Motion to Correct Error:

"Mr. Evans and I also discussed with Mr. Jackson the fact that we could ask the Court for a continuance in light of the change in legal representation. Mr. Jackson was satisfied with the progress of the trial and was confident of my ability to represent his interest providing Bose McKinney would be available to supply the necessary legal research and support for the trial. Based upon our discussion and after reviewing the matter in open court with the Judge, Mr. Jackson agreed to continue the trial with me as lead counsel and with Bose McKinney supporting the effort."

Record at 1404. Clearly, Jackson was aware of what had transpired and acquiesced in the procedure employed by the court. Jackson, therefore, waived any right to a mistrial.

■ Nor do we find that the trial court had a duty to order a mistrial, *sua sponte*. Decisions regarding misconduct and whether it was so improper as to prejudice the fair conduct of a trial are within the sound discretion of the trial court. *Riverside Insurance Co. v. Pedigo* (1982), Ind.App., 430 N.E.2d 796, 809; *Dale v. Trent* (1970), 146 Ind.App. 412, 419–20, 256 N.E.2d 402, 413, *trans. denied.* On appeal, we do not have the advantage of observing the events at trial and their effect on the jurors. Therefore, decisions made by the trial court regarding matters of alleged misconduct of counsel will not be disturbed unless it appears the trial court has abused its discretion and the appellant has been harmed thereby. *Riverside*, at 809; *Dale*, at 419–20, 256 N.E.2d at 413–14. In *Consolidated Rail Corp. v. Thomas* (1984), Ind.App., 463 N.E.2d 315, the only Indiana case we have found on point, a motorist's attorney was permitted to testify as to the authenticity of an earlier railroad agreement given to him by the railroad's attorney. This court affirmed the attorney's testimony as "a matter of formality" thus falling under DR 5–101(B)(2), an exception to the requirements of DR 5–102(A). Judge Young noted that the railroad failed to cite any authority for the proposition that permitting an attorney to testify, in contravention of DR 5–102(A), constituted reversible error. *Consolidated*, at 318. The federal cases in this area follow the same reasoning that absent a showing of prejudice which resulted in an unfair trial, a court is basically vested with the discretion to determine whether to grant a mistrial. *See Dunton v. County of Suffolk* (2d Cir.1984), 729 F.2d 903, 909–10; *MacArthur*, at 1209. Therefore, the trial court did not err in failing to declare a mistrial *sua sponte*.

■ This is true because Jackson has failed to show any error or prejudice in the procedure adopted by the court which resulted in his not receiving a fair trial. Jackson first argues that the change in lead counsel, from Bose to Obremskey, fostered prejudice in the jurors minds. In *MacArthur v. Bank of New York* (S.D.N.Y.1981), 524 F.Supp. 1205, the southern district court of New York declared a mistrial after disqualifying the defendant's attorneys. The court reasoned:

"The defendant needed several weeks to retain and properly inform new trial counsel, making it impracticable to retain the jury that had already been impanelled. The fact that the jury would conceivably speculate to the prejudice of either party as to the reason counsel had been changed after two days of testimony was sufficient reason to warrant a new trial."

*MacArthur*, at 1207–08. While Jackson relies on *MacArthur* for support, it is distinguishable from the facts of his case. Here, Obremskey was involved in the case, from the jury's viewpoint, from the very beginning. It is true, as Jackson asserts, that Bose performed most of the pretrial work. However, Obremskey served as counsel during *voir dire* and also at trial, cross-examining Dutton extensively. Therefore, when Obremskey returned as lead counsel on the second week of the trial he was not a new and unfamiliar face to the jury. In addition, in *MacArthur* the court would have had to hold the jury for several weeks while the defendant retained and properly informed new trial counsel. However, in the present case, the jury returned the following week merely to see Obremskey, with whom they were already familiar, take the leading role as Jackson's trial counsel. Meanwhile, the Bose attorneys were permitted to remain in the court room and assist at counsel table. In addition, the trial court offered to provide an explanation regarding the change in counsel to the jury but this was refused by Obremskey. Record at 2590–91. While we cannot examine the thoughts of the jury, we do not feel that the change in counsel here was such as to lead to speculation and prejudice the jurors' outlook. The only thing speculative is Jackson's assertion that impeachment must have occurred in the minds of the jury.

■ Jackson also argues that the change in counsel led to an unfair trial because Obremskey lacked the familiarity and expertise with the case that Bose possessed. Essentially this assertion centers on the effectiveness of Obremskey as trial counsel. As previously noted, the ineffective assistance of counsel is not grounds for a new trial in a civil context. *Johnson v. Rutoskey* (1984), Ind.App., 472 N.E.2d 620, 623; *In re Marriage of Ford* (1984), Ind. App., 470 N.E.2d 357, 360–61, *trans. denied.* Ideally, of course, the attorney who prepares a case for litigation is in the best position to argue that case in court. However, here Jackson agreed to the change in lead counsel. Moreover, on appeal Jackson fails to present any examples of errors that Obremskey may have committed. Instead, he merely asks us to assume that Obremskey's representation was less than effective. This we will not do.

The procedure adopted by the trial court attempted to resolve the disqualification problem in a manner feasible and fair to all those involved. While not permitting Bose to conduct the trial, the trial court allowed them to remain in the court room and assist Obremskey so as not to deprive Jackson of the firm's expertise. This procedure prevented Bose from committing an ethical violation which would have been unfair to Russell and PPG. Furthermore, Jackson agreed to this procedure and appeared satisfied with it. Jackson has failed to demonstrate any prejudice that would constitute reversible error and, therefore, the trial court did not err in failing to declare a mistrial.

■ Finally, it must be noted that Jackson continually asserts that opposing counsel was also responsible for his predicament by failing to bring the potential ethical problem to his or the court's attention. It is true that attorneys are officers of the court and are obligated to adhere to the disciplinary rules and report any incidents involving violations of a disciplinary rule of which they have unprivileged knowledge. Indiana Code of Professional Responsibility, DR 1–102(A), 1–103(A). On March 14, 1984, PPG filed a motion to disqualify Bose on the basis of conflict of interest, which was denied. Bose assured the trial court that there would be no ethical problems because Kassing and Wills would not need to testify. Throughout, Russell's attorneys

deferred to the professional judgment of Bose with regard to this matter. Russell's attorney's stated, however, that any possible disqualification should be complete and, therefore, objected to Bose's silent participation. The trial court, therefore, was aware of the potential conflict at least six months prior to trial. In addition, as the evidence has indicated, Jackson appeared to be aware of the problem some time before the trial began. Given all of these factors, counsel for Russell and PPG did not breach any duty to Jackson greater than the duty owed to him by his own attorneys.

*Issue Two*

Jackson next argues the verdict on joint venture was improper. The final jury instruction regarding the elements of joint venture, instruction 13, stated:

"One of plaintiff's claims is that a joint venture existed between Russell and Jackson. A joint venture is an association of two or more persons to carry out a single business enterprise for profit. You may find that Plaintiff and Defendant had entered into a joint venture if you determine that the following elements were present:
1. If you find a contract existed, and that there was:
2. An agreement to share profits; and
3. A right of mutual control over the subject matter of the enterprise."

Record at 1369. Final jury instruction number 15 stated:

"Participants in a joint venture have a fiduciary duty to their co-venturers. That fiduciary duty imposes on the participants the obligation of loyalty to their co-venturer and of the good faith, fairness and honesty in their dealings with each other with respect to matters pertaining to the enterprise.

"If you find that a joint venture did exist, and that defendant Jackson did not meet the standard of conduct required of a co-venturer, then you may find for the plaintiff on this claim."

Record at 1370. Jackson made the following objection to these instructions:

"Defendant objects to the giving of Plaintiff's final instruction # 13 as an insufficient statement of the law, and an incorrect statement of the 'law on the issue of the joint venture. Defendant objects to the giving of Plaintiff's final instruction # 15 on the grounds that there is insufficient evidence to support the giving of a final instruction with respect to the fiduciary duty concerning the existence of a joint venture. This objection also applies—further grounds for objection—also applies to Plaintiff's final instruction # 13 concerning existence of a joint venture."

Record at 5443–44.

Under Indiana Rules of Procedure, Trial Rule 51(C) an objection on the grounds that an instruction is an incorrect, incomplete, improper or insufficient statement of law has been deemed insufficient to preserve any error on appeal. *Brandon v. State* (1978), 268 Ind. 150, 154, 374 N.E.2d 504, 506–07; *Whitten v. State* (1975), 263 Ind. 407, 413, 333 N.E.2d 86, 91; *City of Indianapolis v. Ervin* (1980), Ind.App., 405 N.E.2d 55, 62. Instead, an objecting party must state distinctly the matter to which he objects and the grounds for his objection, before the jury retires. T.R. 51(C). The purpose of this rule "is to give the trial court an opportunity to correct any error if it exists. If this is not done promptly and *specifically,* the alleged error is waived on appeal." *New York, Chicago, & St. Louis R.R. Co. v. Henderson* (1957), 237 Ind. 456, 478, 146 N.E.2d 531, 543 (emphasis in original). In addition, failure to offer a more accurate instruction than the one being objected to will result in waiver of any error resulting therefrom. *City of Indianapolis,* at 62. While Jackson claims, in his brief, that several elements were omitted from the joint venture instruction given by the trial court, he failed to include these elements in his own tendered instruction. Record at 1266. Jackson's objections were insufficient and he has, therefore, waived any error regarding the joint venture verdict.

*Issue Three*

 Jackson argues that Russell failed to produce sufficient evidence to show that a contract existed between Russell and PPG, of which Jackson had knowledge, and which he induced PPG to breach, to support the jury's verdict of tortious interference. In reviewing sufficiency questions, this court will not reweigh the evidence or assess the credibility of witnesses, but will examine only that evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom. *Terre Haute Regional Hospital, Inc. v. El-Issa, M.D.* (1984), Ind.App., 470 N.E.2d 1371, 1378, *trans. denied; First National Bank of New Castle v. Acra* (1984), Ind.App., 462 N.E.2d 1345, 1348. We will set aside the jury's verdict only where there is a total lack of evidence or where it is contrary to uncontradicted evidence. *Terre Haute,* at 1378; *First National,* at 1348; *Trinity Lutheran Church v. Miller* (1983), Ind. App., 451 N.E.2d 1099, 1102, *trans. denied.* It is from this standard that we address Jackson's sufficiency claim.

Here, Russell presented sufficient evidence to support the jury's verdict on this issue. Russell argues there were essentially two contracts established between himself and PPG. The first was the Restated Agreement entered into August 15, 1980, which provided for the sale of the PFD to Russell, with a closing date of September 30, 1980. The second was the oral agreement of September 30, 1980, as consideration for Russell's agreement to assign PPG the right to sell Ideal Mold. This consisted of: PPG's assurance it would sell the PFD to Russell on the same terms if he obtained financing; that it would credit the sale of Ideal Mold to the purchase price; that they would keep each other mutually informed of their efforts; and that it would not sell the PFD to Jackson.

Jackson denies knowledge of the existence of either contract after September 30, 1980. However, there is evidence to the contrary. On September 30, 1980, after quitting the deal with Russell, Jackson telephoned Linge regarding the purchase of the PFD for himself and was informed, by Linge, that PPG would not deal with him since Russell had brought him into the deal. Jackson also approached Butera on that same day regarding the possible purchase of the PFD. Despite this knowledge, Jackson continued to inquire into the possible purchase of the PFD by telephoning O'Neil, PPG's vice-president. In addition, upon discovery, Russell's attorney notified Jackson and PPG of Russell's belief that their actions were contrary to his agreements with PPG. Regardless, PPG eventually sold the PFD to Jackson. Jackson argues that the Restated Agreement expired September 30th and that he had no knowledge of the oral agreements. However, at trial Russell relied on Jackson's actions of September 30th as the basis for his claim of tortious interference with the Restated Agreement which was still in effect. Regardless, this merely asks us to reweigh the evidence, which we are not at liberty to do. Therefore, given our standard of review, we find Russell presented sufficient evidence from which the jury could find the elements necessary to support its verdict of tortious interference.

*Issue Four*

 Jackson further argues that if the verdict for "tortious interference" is retained we must render judgment against PPG for breach of its warranty that it had no contractual obligations with Russell. The PFD agreement between Jackson and PPG upon which Jackson relies states: "[T]he execution and delivery of and performance under this Agreement ... and its consummation ... will not ... result in any breach of ... any agreement ... to which Seller is a party." Record at 3388. Similar language in a letter dated October 31, 1980, states: "The execution, delivery of and performance under the Agreement ... will not result in a breach of ... contract ... to which PPG is a party...." Record at 4438. Since tortious interference requires the existence of a contract, Jackson asserts that the verdict against him proves PPG breached the above warranty and, there-

fore, the jury's verdict on this issue is erroneous.

However, as the evidence demonstrates, the jury's decision that PPG did not breach any warranties to Jackson is not inconsistent with its finding that Jackson tortiously interfered with Russell's contract. As noted above, the basis of Russell's claim of tortious interference involved Jackson's actions on September 30, 1980. This was the final day of the Restated Agreement between Russell and PPG. Execution of the sales agreement between PPG and Jackson took place on October 20, 1980, after the Restated Agreement had expired. The execution of the sale agreement between PPG and Jackson, therefore, could not have resulted in the breach of the Restated Agreement, which no longer existed. Instead, it was Jackson's interference with the Restated Agreement on September 30th which resulted in a breach. Consequently, PPG did not breach any warranty contained in its contract with Jackson.

■■■ In addition, the Agreement between Jackson and PPG bars him from relying on any warranties he now asserts regarding the absence of claims made by Russell. Paragraph 16 of that agreement provides:

"Neither party hereto knows of any facts which would make any representations or warranties made in this Agreement by the other party untrue or misleading. No representation or warranty made in or pursuant to this Agreement may be relied upon by Purchaser or Seller if and to the extent such party knows that such representation or warranty is untrue or misleading."

Record at 3388. Hence, if Jackson knew of any facts which would make representations in the agreement misleading or untrue when the contract was negotiated and signed, he could not rely on those representations. The evidence demonstrates that Jackson and his attorneys knew Russell had threatened to sue both Jackson and PPG as a result of the proposed purchase but that Russell might agree to release his claim with PPG. Moreover, they knew that

a written agreement not to sue PPG was negotiated between Russell and PPG in late October. Jackson also knew the exact terms of Russell and PPG's Restated Agreement which was followed by Jackson and PPG. Finally, PPG had requested indemnification from Jackson in the parties' initial negotiations and Jackson was fully aware that he and PPG had failed to reach an agreement on this issue. Clearly, Jackson was aware of facts which made PPG's warranty misleading or untrue and, therefore, according to Paragraph 16, he is barred from relying on those warranties. The jury did not err in finding for PPG on Jackson's claim of breach of warranty, nor is that decision inconsistent with the tortious interference verdict.

*Issue Five*

■■■ Jackson argues that he was not liable for constructive fraud and that the instruction on this issue was erroneous and incomplete. The final instruction on constructive fraud given to the jury stated:

"Another of Russell's claims is based upon a theory of law known as 'constructive fraud'. Constructive fraud is a breach of a legal or equitable duty that the law declares fraudulent because of its tendency to deceive others. It is not necessary that plaintiff prove that there was actual dishonesty or an intent to deceive in order to establish constructive fraud.

"In order for Russell to recover on this theory, he must prove:

1. That Jackson made material representations to Russell that were false;

2. That Russell relied upon these misrepresentations to his detriment; and

3. That Jackson obtained an unfair or unconscionable advantage from these misrepresentations."

Record at 1379. Jackson made the following objection to the instruction:

"Defendant further objects to the giving of Plaintiff's final instruction # 25 with respect to the theory of constructive fraud on the grounds that there is not sufficient evidence with respect to the

submitting this theory to the jury, and is an incomplete and incorrect statement of the law.

"Defendant further objects to the giving of Plaintiff's final instruction # 9 with respect to the—again, the constructive fraud on the grounds that there is insufficient evidence to submit that claim to the jury.... To correct the record, I believe I referred at one point to Plaintiff's final instruction # 9 on the theory of constructive fraud and an award of punitive damages, and objecting to it on the basis of insufficient evidence. It is marked as Plaintiff's final # 26."

Record at 5444–5446.

As noted previously, an objection that an instruction is an incorrect, incomplete, improper or insufficient statement of law is insufficient to preserve any error on appeal. *Brandon v. State* (1978), 268 Ind. 150, 154, 374 N.E.2d 504, 506–07; *Whitten v. State* (1975), 263 Ind. 407, 413, 333 N.E.2d 86, 91; *City of Indianapolis v. Ervin* (1980), Ind.App., 405 N.E.2d 55, 62; T.R. 51(C). Instead, a party must state distinctly the matter to which he objects and the grounds for his objection, before the jury retires. T.R. 51(C). If this is not done promptly and specifically the alleged error is waived on appeal. *New York, Chicago, & St. Louis R.R. Co. v. Henderson* (1957), 237 Ind. 456, 478, 146 N.E.2d 531, 543. Therefore, Jackson has failed to preserve any error on appeal and the constructive fraud verdict is affirmed.

*Issue Six*

■ Jackson asserts that the trial court erred in refusing to admit his tendered Exhibit 237 under the business records exception to the hearsay rule. Exhibit 237 was an internal PPG memorandum from Webb, a PPG attorney, to O'Neil, a PPG vice-president. The parties stipulated as to the authenticity of all exhibits early in the trial proceedings. Jackson attempted to admit the memorandum into evidence on several occasions, but without laying the proper foundation. Jackson appears to argue, however, that the parties' stipulation as to the authenticity of exhibits satisfies the need to lay a proper foundation under the business records exception. .

Jackson failed to overcome the prohibition against hearsay evidence. Traditionally, the business records exception to the hearsay rule permits the admission of documentary evidence if identified by its entrant or one under whose supervision it is kept and shown to be an original or first permanent entry, made in the routine course of business, at or near the time of the recorded transaction, by one having the duty to so record and personal knowledge of the transaction represented by the entry. *American United Life Insurance Co. v. Peffley* (1973), 158 Ind.App. 29, 36–37, 301 N.E.2d 651, 656. More recent case law has relaxed the requirement that the witness laying the foundation must be either the person who made the record, or the record custodian. *Baker v. Wagers* (1984), Ind. App., 472 N.E.2d 218, 221, *trans. denied.* However, in Indiana, it is clear that the witness through which a business record is to be admitted must have personal knowledge of the various elements of the foundation. *Wilson v. Jenga Corp.* (1986), Ind. App., 490 N.E.2d 375, 377; *Baker* at 221. Jackson attempted finally to admit Exhibit 237 during the cross-examination of Malarkey, a PPG employee. Malarkey, however, failed to demonstrate any personal knowledge of the memorandum. Jackson's earlier attempts to admit the Exhibit, relying on the assertion that the memorandum was its own foundation, merely asked the court to accept that everything the memorandum said was true and accurate. Jackson did not attempt to lay a proper foundation and therefore the trial court did not err in refusing to admit Exhibit 237 under the business records exception to the hearsay rule.

*Issue Seven*

■ Jackson also asserts that the trial court erred in admitting the testimony of John Crane (Crane), a CPA and attorney, regarding the value of the PFD and Russell's loss of future profits. Admissibility of evidence is within the sound discretion of the trial court. We will reverse only where the trial court's action is clearly

erroneous and against the facts and circumstances before the trial court or reasonable inferences to be drawn therefrom. *Estate of Ballard v. Ballard* (1982), Ind. App., 434 N.E.2d 136, 139–40; *English Coal Co., Inc. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302, 309, *trans. denied.* Jackson first argues Crane's testimony was improper because it concerned future profits which, Jackson asserts, are too speculative and conjectural to submit to a jury.[3] Jackson misconstrues Crane's testimony. Crane relied upon the financial performance of the PFD from 1980 through 1984, which was documented, and the most recently available data. Crane, however, did not use this data to project future profits but instead used it to formulate his opinion as to the fair market value of the PFD. Moreover, Russell was not seeking lost future profits. Therefore, the trial court did not err in admitting Crane's testimony regarding the value of the PFD.

■ Jackson also complains that it was error to admit Crane's testimony comparing the PFD to other companies. However, it was Jackson who elicited this testimony from Crane on cross-examination and Jackson did not move to strike the testimony. In addition, Jackson failed to raise this in his motion to correct error. Consequently, Jackson has waived any alleged error regarding this testimony. *In re Estate of Paul E. Williams* (1980), Ind.App., 398 N.E.2d 1368, *trans. denied.*

*Issue Eight*

Jackson further argues the trial court erred in modifying his tendered instruction number five. This tendered instruction stated:

"In assessing the fair market value of the PFD when purchased by Mr. Jackson in 1980, you should determine the price which a willing buyer would have paid a willing seller for the PFD at the time of such purchase. In that regard, you may not consider evidence of any profits actually earned by the company after 1980 since that evidence has no tendency to show the fair market value of the PFD in 1980."

Record at 1269. This instruction was given to the jury as modified by striking the last sentence. Jackson asserts this sentence was necessary to cure the prejudice accruing from Crane's testimony.

The giving of instructions is largely a matter entrusted to the trial court's discretion. *Smith v. Insurance Co. of North America* (1980), Ind.App., 411 N.E.2d 638. All jury instructions must be read together and construed as a whole to determine whether the jury was properly instructed. *Wiles v. Mahan* (1980), Ind.App., 405 N.E.2d 591. One instruction need not contain all the law pertinent to the case. *Chicago, Indianapolis, & Louisville R.R., Inc. v. Freeman* (1972), 152 Ind.App. 492, 284 N.E.2d 133, *trans. denied.* Neither will an instruction which is correct be found to be erroneous because it was not an ampler statement of the law. *Smith v. State* (1980), Ind.App., 403 N.E.2d 869, *trans. denied.* In addition, it is not error for a trial court to refuse a tendered instruction the subject of which is adequately covered by other instructions given by the court. *Daniels v. State* (1980), 274 Ind. 29, 408 N.E.2d 1244. Nor does a trial court err for refusing to submit an instruction unless it is under a duty to give the instruction exactly as requested. *Mullins v. Bunch* (1981), Ind., 425 N.E.2d 164; *Hahn v. Ford Motor Co., Inc.* (1982), Ind.App., 434 N.E.2d 943, *trans. denied.*

■ The trial court did not abuse its discretion by modifying Jackson's tendered instruction number five. As noted above, Crane's testimony concerning the fair market value of the PFD did not harm Jackson.

---

**3.** Jackson's reliance on *Prudential Insurance Co. v. Executive Estates, Inc.* (1977), 174 Ind.App. 674, 369 N.E.2d 1117, *trans. denied,* for his proposition that evidence of future profits is too speculative to submit to a jury is misplaced. The *Prudential* court merely stated that, under the circumstances of that case, the evidence of future profits was insufficient to place before the jury. Hence, a jury may consider lost future profits, in an appropriate case, provided there is evidence sufficient to avoid mere jury speculation. *Prudential,* at 702, 369 N.E.2d at 1133.

Moreover, Crane's testimony regarding post–1980 profits was solicited by Jackson upon cross-examination and Jackson did not move to strike this testimony. Waiver of error occurs where an objection to testimony is made and sustained but no motion is made to strike that testimony. *Dean v. Dean* (1982), Ind.App., 439 N.E.2d 1378, 1385. The jury was entitled to consider the testimony that Jackson elicited and the trial court was under no duty to give the instruction exactly as tendered. Therefore, the trial court did not err in modifying Jackson's tendered instruction number five by striking the sentence that would have prohibited the jury from considering post–1980 profits of the PFD.

*Issue Nine*

 Jackson next asserts there was insufficient evidence to support the jury's verdict finding him guilty of criminal mischief. Again, when the sufficiency of evidence is questioned, we will neither reweigh the evidence nor judge the credibility of witnesses, but will examine only the evidence most favorable to the verdict together with all reasonable inferences drawn therefrom. We will set aside the jury's verdict only where there is a total lack of evidence or where it is contrary to uncontradicted evidence. *Terre Haute*, at 1378; *First National*, at 1348; *Trinity*, at 1102. The criminal mischief statute states, in pertinent part: "A person who knowingly or intentionally causes another to suffer pecuniary loss by deception ... commits criminal mischief...." Indiana Code section 35–43–1–2(a)(2) (Burns 1985). The evidence indicates that Jackson refused to provide financing to purchase the PFD and reneged on the buy-sell agreement at the intended closing. Immediately after quitting the deal with Russell, Jackson called PPG and offered to purchase the PFD on

his own. Russell, of course, was thereafter unable to obtain financing and purchase the PFD. Russell also lost the money he had spent in that pursuit. From this evidence the jury could have found evidence sufficient to support its verdict of criminal mischief.

 Jackson bases his sufficiency argument on the lack of evidence to support the notion that his actions amounted to deception. Jackson argues his own definition of deception to reach this conclusion, citing Indiana Code section 35–43–5–3 which is the section dealing with forgery and fraud. Jackson also cites California case law in an attempt to support his substitution of "fraud" as a definition for "deception." He then essentially argues that all the elements of fraud must be established in order to prove deception. However, the fraud and deception definitions Jackson cites to deal with a different class of violations than that involved here. More importantly, Jackson failed to object to the criminal mischief instruction as given by the trial court,[4] nor did he offer a more specific instruction or definition of deception. In the absence of a timely objection, a trial court's instructions as read to the jury, even if erroneous, become the law of the case. *Roger v. Pryor* (1981), Ind.App., 427 N.E.2d 1112, 1115, *trans. denied;* *Board of Commissioners of Monroe County, Indiana v. Hatton* (1981), Ind. App., 427 N.E.2d 696, 699, *trans. denied.* In addition, a party who desires a more specific instruction than that given by the trial court must tender it. *Nationwide Mutual Insurance Co. v. Neville* (1982), Ind.App., 434 N.E.2d 585, 599, *trans. denied.* Therefore, the instruction, as read by the trial court, became the law of the case, and Jackson has waived any alleged error on appeal regarding the definition of "deception." Combining Jackson's waiver

---

**4.** The trial court instruction stated:
 "One of the plaintiff's claims is based upon the alleged violation by defendant Jackson of an Indiana Statute.
 At all times relevant to this transaction, there was in force a statute that provided, in part: A person who:

knowingly or intentionally causes another to suffer pecuniary loss by deception commits criminal mischief."
Record at 1374. Hence, the instruction merely restated Ind.Code § 35–43–1–2(a)(2) defining criminal mischief.

of this argument with our deference to the trier of fact when sufficiency of the evidence is questioned, there was no error in the jury's verdict finding Jackson guilty of criminal mischief.

*Issue Ten*

 Stating that it "would have induced clearer juror thinking," Jackson asserts the trial court erred in failing to inform the jury that some of Russell's theories described in the preliminary instructions had been eliminated from their consideration by judgments on the evidence. Jackson's argument is meritless. The court's final instructions identified each of the remaining theories upon which Russell was proceeding, setting out the elements necessary to prove each one. In addition, the verdict form specifically included only those theories the jury was to consider. Furthermore, Jackson neither requested an instruction informing the jury of which theories had been withdrawn, nor did he object to the trial court's failure to give one. Therefore, any alleged error committed by the trial court in failing to instruct the jury as to what matters were withdrawn from its consideration has been waived. *Reith-Riley Construction Co. v. McCarrell* (1975), 163 Ind.App. 613, 629, 325 N.E.2d 844, 854.

*Issue Eleven*

 Jackson also argues the judgment should not exceed $1,255,000.00. The trial court's verdict form divided recoverable damages into two parts, compensatory and punitive. Under Paragraph A(1) the jury determined the amount of compensatory or actual damages to Russell to be $1,255,-000.00. The verdict form then provided the jury with two alternative methods of awarding punitive damages, if they so chose. Paragraph B(1) provided for a statutory punitive award pursuant to Indiana Code section 34–4–30–1 at up to three times the amount of actual damages if the jury found against Jackson on the criminal mischief issue. Paragraph C(1) permitted the awarding of common law punitive damages

for other counts. The verdict form specifically instructed the jury that it could not award both types of punitive damages. The jury awarded compensatory damages, under Paragraph A(1), in the amount of $1,255,000.00. The jury then awarded damages in the amount of $745,000.00 under Paragraph B(1). Jackson asserts that since the jury did not state two separate figures under B(1), one for actual damages resulting from criminal mischief, and the other for the penalty (treble damages), it must be assumed the jury assessed only "actual" damages. Since there is nothing to indicate the $745,000.00 was not for "actual" damages, Jackson argues that the trial court erred in assuming this was a punitive award and adding it to the compensatory award. Hence, Jackson argues the trial court erred by allowing more than one recovery for damages by improperly adding the figures.

Indiana Code section 34–4–30–1 provides the basis and recovery for a civil action for criminal mischief:

"If a person suffers a pecuniary loss as a result of a violation of IC 35–43, he may bring a civil action against the person who caused the loss for:

(1) An amount not to exceed three [3] times his actual damages;

(2) The costs of the action; and

(3) A reasonable attorney's fee."

An award pursuant to this statute may be aggregated with compensatory damages as confirmed by Indiana Code section 34–4–30–2:

"Criminal prosecution not a defense— Punitive damages authorized.—It is not a defense to an action for punitive damages that the defendant is subject to criminal prosecution for the act or omission that gave rise to the civil action. However, a person may not recover both:

(1) Punitive damages; and

(2) The amounts provided for under section 1 [34–4–30–1] of this chapter."

Since the jury awarded punitive damages in an amount less than its compensatory damage award, the $745,000.00 was entirely punitive in nature and therefore properly

aggregated with the compensatory award. Hence, the trial court did not err in adding the two amounts together nor did the court permit Russell more than one recovery.

*Issue Twelve*

██ Finally, Russell asserts, on cross-appeal, that the trial court erred in granting Jackson's Trial Rule 50 motion regarding Russell's claim for promissory estoppel. Trial Rule 50 permits a trial court to withdraw an issue from the jury and enter a verdict thereon where the issue is not supported by sufficient evidence. Indiana Rules of Procedure, Trial Rule 50. Generally, a motion for judgment on the evidence may be properly granted only where there is no evidence or reasonable inference therefrom to support an essential element of a claim. *Stanley v. Fisher* (1981), Ind. App., 417 N.E.2d 932, 936, *trans. denied.* However, we do not need to address this claim. The general test on appellate review with respect to the impact of errors is whether it appears that a right result was reached. *Atwood v. Prairie Village, Inc.* (1980), Ind.App., 401 N.E.2d 97, 100. Given our holding today, sustaining the trial court's verdict favoring Russell in all respects, any possible error committed by the trial court in granting Jackson's T.R. 50 motion is rendered harmless.

We therefore affirm the judgment of the trial court.

ROBERTSON, P.J., concurs.

YOUNG, J., sitting by designation, concurs.