## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 27 2018, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Douglas S. Walton
Walton Law Office
Evansville, Indiana

ATTORNEY FOR APPELLEE

Karen A. Wyle
Bloomington, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

M.D.,

*Appellant-Defendant,*

v.

M.B.,

*Appellee-Plaintiff*

June 27, 2018

Court of Appeals Case No.
19A01-1712-AD-2831

Appeal from the Dubois Circuit Court

The Honorable Dean A. Sobecki, Judge

Trial Court Cause No.
19C01-1507-AD-12

**Vaidik, Chief Judge.**

# Case Summary

[1] M.D. ("Father") appeals the trial court's order terminating his parental rights and permitting M.B. ("Stepfather") to adopt his daughter, G.J. ("Child"). Finding no error, we affirm.

# Facts and Procedural History

[2] Child was born out of wedlock to B.J. ("Mother") and Father in July 2005. Father was incarcerated at the time of Child's birth. Mother filed a petition to establish paternity in April 2007, and the trial court issued a paternity order in June 2007. According to the order, Father acknowledged under oath that he is the father of Child and Mother was given "sole legal and primary physical custody" of Child, with Father having parenting-time rights "as agreed to by the parties." Appellee's App. Vol. II p. 11. In addition, Mother waived any child-support arrearage that had accrued from the date of Child's birth until Father entered his work-release program, and the court set a payment schedule for the remaining arrearage and future child support.

[3] When Child was two-and-a-half years old, Mother became involved with Stepfather. Mother and Child have lived with Stepfather since approximately 2010, and Child has called Stepfather "dad" ever since that time. Tr. p. 77. Mother and Stepfather married in June 2013.

[4] Meanwhile, in 2010, Mother filed a petition to modify Father's parenting time. In 2011, the trial court modified Father's parenting time due to Father being "so

inconsistent in exercising his parenting time, despite being unemployed much of the time, that it [was] having a negative impact on [Child]." Appellee's App. Vol. II p. 15. Accordingly, the court ordered that Father's parenting time "should be restricted and supervised by a professional therapist." *Id.* The court also reduced Father's child support as a result of his restricted parenting time and increased the amount that Father had to pay toward his arrearage.

[5] In June 2013, the trial court found Father in contempt for failing to pay child support and failing to follow the court's other orders including how to obtain parenting time and then appearing in court and misleading the court about his counseling. The court ordered Father to serve thirty days in jail, with the first two days served on a weekend and the remaining days stayed on the condition that he start paying child support by June 21. *Id.* at 19. According to the order, if Father did not start paying child support by June 21, then he would have to serve another weekend in jail. *Id.* It appears that Father never served any time in jail for this contempt finding, however. *See id.* at 9 (CCS entry dated June 27, 2013, noting that Father "has not reported to the Dubois Co. Security Center for the past two weekends").

[6] A review hearing was held on October 23, 2014. After the hearing, Mother and her attorney were waiting for the elevator when Father approached them and asked what he could do to "end this case". Tr. p. 39. Mother's attorney—who was aware that Mother and Stepfather had been discussing the possibility of Stepfather adopting Child—told Father that he could relinquish his parental rights to Child and that Mother would forgive his child-support arrearage and

future child-support obligations. *Id.* Mother's attorney told Father (who did not have an attorney in the paternity case) to come to his office the next day to sign the documents. The next day, Father appeared at Mother's attorney's office to sign the documents; however, the documents were not ready because the attorney had underestimated the time needed to prepare them. In the meantime, Father "called [the attorney's] office several times . . . inquiring about the status of the documents." *Id.* at 40.

[7] When the documents were finally ready, Father came to Mother's attorney's office on November 11, 2014. Office staff then provided Father with copies of the documents and gave him time to review them. *Id.* at 43-44. According to Mother's attorney, the following events then transpired:

> After [Father] had sufficient time to read [the documents], he was shown into my office, and I met with him for approximately five minutes or so. I asked him if he understood the documents, and he indicated that he did understand. I asked him if he was being threatened or coerced or influenced by anyone to engage in signing the documents. He indicated that he . . . was not and that he was acting of his own free will and volition. I asked him if he wanted to sign the documents. He did.

*Id.* at 44. In the presence of Mother's attorney, Father then signed an "Agreed Judgment and Order" that was to be filed in the paternity case and a "Consent to Adoption." Mother's attorney then notarized the documents. *See* Ind. Code § 31-19-9-2(a) (setting forth the requirements of a consent to adoption, including that it be executed in the presence of the trial court, a notary public, or an agent of the Department of Child Services or a licensed child-placing agency).

According to the Agreed Judgment and Order, Father's "parenting time rights with [Child] [were] permanently terminated" and his "child support obligation, child support arrearage, obligation to reimburse [Mother's] attorney fees, past or future, and all other financial obligations established through this cause [were] forgiven and vacated." Oct. 2, 2015 Ex. 2. The Agreed Judgment and Order also provided that Father "shall execute and deliver a consent to adoption simultaneously with the execution, delivery and approval of this Agreed Order and Judgment." *Id.* The Consent to Adoption provided:

> [Father], being first duly swor[n] upon oath, states that he has been advised and fully understands that [Stepfather] may seek to adopt his natural child [Child]; and, [Father] freely and voluntarily consents to the proposed adoption, acting without duress, coercion or undue influence of any kind.

Appellant's App. Vol. II p. 135. A week later, on November 18, the trial court approved the Agreed Judgment and Order and entered judgment accordingly. The paternity case was then closed. Appellee's App. Vol. II p. 9.

[8] Father was arrested in December 2014, convicted of Level 5 felony intimidation in July 2015, and sentenced to six years in the Department of Correction in September 2015. As a result, he was incarcerated for the remainder of these proceedings.

[9] On July 9, 2015, in the midst of Father's criminal proceedings, Stepfather filed a petition to adopt Child. The petition included a statement that "Father previously acknowledged and consented to the adoption pursuant to the Court

order in [the paternity case] dated November 18, 2014."[1] Appellant's App. Vol. II p. 181. Father, however, informed the trial court during a hearing that he did **not** consent to the adoption of his daughter and wanted an attorney. Tr. p. 5. The court appointed Father an attorney and set a hearing to address the validity of Father's November 11, 2014 Consent to Adoption.[2] Father's attorney later filed a formal motion to contest the validity of Father's consent to the adoption. *See* Appellant's App. Vol. II p. 7 (CCS entry).

[10] At the June 2016 hearing, the trial court took judicial notice of the proceedings in the paternity case. Father then testified that he had never met individually with Mother's attorney and did not recall what documents he signed. However, he said that whatever documents he did sign, they were signed "under fraud or duress." Tr. p. 29. Specifically, he claimed that he was "treated unfairly" by the judge in the paternity case and that Mother and her attorney told him that if he signed the documents, "they . . .wouldn't put [him] in jail [and] [t]he judge wouldn't find [him] in contempt." *Id.* at 27-29. Father explained that given the choice of "going to jail and not being able to support my other children," he chose to sign the document. *Id.* at 32. Mother's

---

[1] Mother misplaced the Consent to Adoption, and it was not filed in the adoption case until March 4, 2016. *See* Appellant's App. Vol. II p. 7 (CCS entry).

[2] In light of Father's claim that he did not consent to the adoption, Stepfather filed a supplemental adoption petition, which alternatively alleged that Father's consent was not required because he failed without justifiable cause to communicate significantly with Child when able to do so for a period of at least one year. *See* Appellant's App. Vol. II p. 164 (citing Ind. Code § 31-19-9-8). Because the trial court found consent, it did not reach the issue of whether Father's consent was required according to Section 31-19-9-8. Because we affirm the trial court's finding that Father validly consented to the adoption, we do not reach the issue either.

attorney then testified to the events as set forth above. He also testified that he did not tell Father that he would go to jail if he didn't sign the documents, because he didn't "have the authority to send somebody to jail." *Id.* at 41. In August 2016, the trial court issued an order finding that Father validly consented to the adoption:

> (12) The Court heard testimony from [Father] that he did not meet individually with [Mother's attorney] and that he could not recall what paperwork he may have signed. [Father] further testified that he felt pressured due to his treatment by the Court [in the paternity case].

> (13) [Mother's attorney] testified that [Father] approached him about settling matters in [the paternity case]. He further testified that [Father] appeared at his office twice, called several times, and executed a Consent to Adoption and an Agreed Judgment and Order that settled matters in [the paternity case]. [Mother's attorney] stated that [Father] read the documents and that [Father] indicated that he was executing the documents without duress or coercion.

> (14) The Court finds that [Father] failed to show by clear and convincing evidence that his consent was induced through threat or coercion.

Appellant's App. Vol. II p. 109.

[11] The adoption proceedings continued, and the final hearing was held in September 2017. Father's criminal records were admitted into evidence. *See* Sept. 29, 2017 Exs. 1-19. In addition, Mother testified about Father's lack of involvement in Child's life:

[Father] has not had any contact with [Child] since she has been approximately six years old. There has not been a card. There [have] been no phone calls. There has been nothing. And I'd be okay if . . . he couldn't find us, but I'm out there. He can find me any way, shape, or form, and he never has.

Tr. p. 91. Stepfather testified that Child was an "AB student," very outgoing, and involved in many activities. *Id.* at 76. Stepfather said he had been acting as Child's father for several years and that he loved Child "as if she was [his] own natural born daughter" and "just like my two [adult sons]" (he also said his sons treated Child as if she was their natural sister). *Id.* at 87. The trial court issued the adoption decree in November 2017. It found that Father validly consented to the adoption (as set forth in its August 2016 order) and that adoption is in the best interests of Child:

> 7. [Stepfather] loves [Child]. [He] is capable of rearing [Child] and furnishing her with suitable love, support, and education and has in fact been doing so since [Child] was 2 1/2 years of age. . . .

> 8. [Stepfather] has been acting as [Child's] father in all respects for many years. [Child] is an A-B student and is active in many activities . . . . By all accounts, [Child] is a well-adjusted and well-behaved child.

> * * * * *

> 10. [Father] . . . argued that he is going to change his ways and wants to be a part of [Child's] life. [Father] is currently incarcerated at the Indiana Department of Correction serving a six (6) year sentence for Intimidation, a Level 5 felony. The following is an excerpt from the Appellate Court's October 17,

2016 decision in [Father's] [appeal of his intimidation conviction]:

> Turning to [Father's] character, his involvement with law enforcement dates back to when he was nine years old. Throughout his life, he has been charged with seventy-seven separate criminal offenses. At least twelve of his arrests have been for physically violent offenses, and he has had probation revoked at least five times. . . . While [Father's] offense may not be the worst of the worst, his character very nearly is. He evinces no respect for the law or his fellow citizens and is either unable or unwilling to lead a law[-]abiding life. He has had multiple opportunities to turn his life around but has failed or refused to do so.

> The Court finds [Father's] statement that he will change unpersuasive. The evidence presented is that [Father] has not been a part of [Child's] life since she was five years of age. [Child] is now twelve years of age. [Father] has not sent [Child] a card, present, or letter. [Father's] criminal history is lengthy. The adoption of [Child] by [Stepfather] is in the best interests of the child.

Appellant's App. Vol. II pp. 23-24.

[12] Father now appeals.

# Discussion and Decision

[13] Father contends that the trial court erred in finding that he validly consented to the adoption and that adoption is in the best interests of Child. When reviewing a trial court's ruling in an adoption proceeding, we will not disturb

that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). We presume that the trial court's decision is correct, and we consider the evidence in the light most favorable to the decision. *Id.* We neither reweigh the evidence nor assess the credibility of the witnesses. *Bell v. A.R.H.*, 654 N.E.2d 29, 32 (Ind. Ct. App. 1995).

# I. Consent

[14] Generally, a petition to adopt a minor child may be granted only if written consent has been executed by the biological parents. *See* Ind. Code § 31-19-9-1(a)(2). Once consent is given, it can only be withdrawn by filing a motion with the trial court. Ind. Code § 31-19-10-1(c). But there are limits on a party's ability to withdraw a consent to adoption. That is, a consent to adoption may be withdrawn "not later than thirty (30) days after consent to adoption is signed" provided that the person seeking the withdrawal is acting in the best interests of the person sought to be adopted, and consent "**may not be withdrawn after . . . thirty (30) days after the consent to adoption is signed**." Ind. Code § 31-19-10-3(a), (b)(1) (emphasis added).[3]

---

[3] An earlier version of Section 31-19-10-3 did not contain the thirty-day time limit for withdrawing consent. It instead provided: "A consent to adoption may not be withdrawn **before the entry of the adoption decree**" unless the court finds that the person seeking the withdrawal is acting in the best interests of the person sought to be adopted and the court orders the withdrawal. P.L. 1-1997, § 11 (emphasis added); *see also* Ind. Code § 31-3-1-6(h) (predecessor statute that was repealed). The thirty-day time limit was added to Section 31-19-10-3 effective July 1, 2003. *See* P.L. 61-2003, § 18.

[15] Father acknowledges that he failed to withdraw his consent within the thirty-day period set forth in Section 31-19-10-3; nevertheless, he claims that his consent is invalid because it was obtained by duress and undue influence and therefore the court should not have held him to it. *See In re Adoption of Hewitt*, 396 N.E.2d 938, 941 (Ind. Ct. App. 1979) ("Voluntariness is distinguishable from the issue of withdrawal of consent. If a consent is given involuntarily, the issue is not one of withdrawal of the consent but rather the validity of the consent itself.").

[16] The right to raise one's child is an essential and basic right more precious than property rights and is within the protection of the Fourteenth Amendment to the United States Constitution. *In re Adoption of M.P.S.*, 963 N.E.2d 625, 629 (Ind. Ct. App. 2012). Accordingly, "Indiana's statutes governing adoptions should not be so liberally construed that safeguards erected for the preservation of family relationships are destroyed." *Id.* (quotation omitted). For a parent's consent to the adoption of their child to be valid, the consent must be a voluntary consent to termination of all parental rights. *Id.* That is, it must be "an act of the parent's own volition, free from duress, fraud, or consent-vitiating factors." *Id.* Emotion, tensions, and pressure are insufficient to void a consent unless they rise to the level of overcoming one's volition. *In re Adoption of M.L.L.*, 810 N.E.2d 1088, 1093 (Ind. Ct. App. 2004).

[17] Father argues that his consent was obtained through duress and undue influence because he was "undoubtedly under a significant amount of stress and pressure as he had already been the subject of a contempt citation . . . . He

could not believe that anything different was going to occur when he appeared before the paternity trial court in October of 2014." Appellant's Br. p. 15. Accordingly, Father claims that "the significant emotions, tensions and pressures that were being applied to [him] in October and November of 2014 rose to the level of overcoming his own volition. He could not make any other choice than to sign the consent to adoption." *Id.*

[18] Father, however, made these same arguments to the trial court. Mother's attorney largely disputed them, pointing out that Father was the one who initiated a discussion with him and Mother on October 23, 2014, about ending the paternity case, came to his office the next day to sign the documents, and then called his office several times until the documents were finally ready. Thus, Father had almost three weeks to think this through before he signed the documents on November 11. And contrary to Father's testimony, Mother's attorney testified that he confirmed with Father that he was signing the documents of his own free will and volition and that he did not threaten Father with jail time. *See also* Appellant's App. Vol. II p. 135 (signed consent setting forth that Father "freely and voluntarily consents to the proposed adoption, acting without duress, coercion or undue influence"). Based on this evidence, the trial court, which was in the best position to observe the demeanor and judge the credibility of the witnesses, found that Father failed to prove that his consent was induced through threat or coercion and that, therefore, it was valid. We cannot say that the evidence presented led only to the conclusion that Father's consent was obtained through duress and undue influence. We

therefore affirm the trial court's finding that Father validly consented to the adoption.[4]

# II. Best Interests

[19] Father also contends that, even if he validly consented to the adoption, the trial court erred in finding that the adoption is in the best interests of Child. According to Indiana Code section 31-19-11-1(a), the trial court must find that the adoption is in the best interests of the child before issuing an adoption decree. The adoption statute does not provide guidance for which factors to consider when determining the best interests of a child in an adoption proceeding, but we have noted that there are strong similarities between the adoption statute and the termination-of-parental-rights statute in this respect. *In re Adoption of M.S.,* 10 N.E.3d 1272, 1281 (Ind. Ct. App. 2014). In termination cases, we have held that the trial court is required to look to the totality of the evidence to determine the best interests of a child. *Id.* Relevant factors include, among others, a parent's historical and current inability to provide a suitable environment for the child and the child's need for permanence and stability. *Id.* at 1281-82.

[20] In determining that the adoption is in the best interests of Child, the trial court found that Stepfather had been a part of Child's life since she was two-and-a-

---

[4] Because we affirm the trial court's finding that Father validly consented to the adoption, we do not address Father's alternate argument that the trial court erred in finding that Father's consent was irrevocably implied because he failed to timely contest the adoption.

half years old and that he had been acting as her "father in all respects for many years." It found that Child was a good student who was involved in many activities and well adjusted. In contrast, it found that Father, who was then in prison and had an extensive criminal history, had not been a part of Child's life since she was five years old and had not even sent her a card, present, or letter. On appeal, Father does not challenge these findings. Rather, he claims that he did not know Mother's contact information, he tried to see Child but Mother would not let him, and that it was the judicial system's fault for not letting him see Child. However, the only evidence he cites in support of these claims is his own testimony, which the trial court was free to disbelieve. The trial court did not err in determining that adoption is in the best interests of Child.

[21] Affirmed.

Pyle, J., and Barnes, Sr. J., concur.