**FOR PUBLICATION**



FILED

Mar 14 2012, 9:14 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RYAN D. BOWER**
Allen Allen & Brown
Salem, Indiana

ATTORNEY FOR APPELLEES:

**CATHERINE ROIANN BROWNING**
Browning Law
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE ADOPTION OF M.P.S., JR. | ) | |
| | ) | |
| A.S., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 88A01-1108-AD-387 |
| | ) | |
| M.P.S., SR., M.S., and An. S., | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE WASHINGTON CIRCUIT COURT
The Honorable Larry W. Medlock, Judge
Cause No. 88C01-1012-AD-45

**March 14, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

A.S. ("Mother") appeals the denial of her motion for relief from judgment, wherein she alleged fraud, duress, and lack of procedural due process in the adoption of M.P.S., Jr., her child with M.P.S., Sr. ("Father"), by Father's mother and step-father ("Grandparents"). Mother presents the sole issue of whether the trial court erred in refusing to set aside the adoption. We reverse and remand with instructions.

**Facts and Procedural History**

M.P.S., Jr. (then M.P.F.) was born on March 2, 2010 to then seventeen-year-old Mother. Father was also seventeen years old. Mother was a resident of the State of Virginia, but gave birth in Tennessee. For the first three months following the birth, Mother, Father, and their child resided in Virginia with Father's father and step-mother ("Virginia Grandparents"). During June of 2010, Mother moved to Grandparents' home in Salem, Indiana to live with Father.

On June 23, 2010, Mother and Father (and Grandmother, due to Father's status as a minor) executed a paternity affidavit in Tennessee, which was then filed with the State of Tennessee Office of Vital Records.[1] The following day, the parents were married. The name on M.P.F.'s birth certificate was changed to M.P.S., Jr.

Mother, Father, and M.P.S., Jr. moved out of Grandparents' home during August of 2010, and returned to the home of Virginia Grandparents. According to Mother, she had

---

[1] According to the language printed on the form, a properly executed paternity affidavit gives rise to a "conclusive presumption" of paternity, unless the acknowledgment is rescinded. (Pet. Ex. 1). The document further informs the father that he has a right to petition the court for visitation or custody. In this matter, neither parent initiated paternity proceedings.

encouraged Father to return to Virginia because, once the young family had moved to Indiana, Grandmother had relentlessly pressured them to relinquish custody of their baby. In the summer, Mother and Father had signed documents, apparently consents to Grandparents' adoption of M.P.S., Jr., but Father purportedly located the papers in Grandmother's lockbox and destroyed them at Mother's insistence.

After moving back to Virginia, the couple briefly separated. They soon reconciled and, on November 10, 2010, Mother and Father moved back in with Grandparents. In Indiana, they were unemployed and financially dependent upon Grandparents.

On December 15, 2010, Mother and Father went to the office of Grandparents' attorney, Alice Bartanen-Blevins ("Bartanen-Blevins"), and signed consents to have M.P.S., Jr. adopted by Grandparents. Bartanen-Blevins purportedly notarized the signatures; however, her notary commission had recently expired. She explicitly advised the young parents that they were executing consents which were revocable up until the time of the adoption hearing, but she urged that revocation should take place within thirty days if at all.[2] Bartanen-Blevins further advised that she was acting solely as counsel for Grandparents.

On December 30, 2010, Grandparents filed a petition to adopt M.P.S., Jr., falsely claiming that they "have had the care and custody of the minor child since March 2nd, 2010."[3] (App. 9.) They contemporaneously filed the parents' consents to adoption. On February 1,

---

[2] It does not appear that they were advised that a court order was required for withdrawal of consents, consistent with Indiana Code Section 31-19-10-3, or that, pursuant to this statute, a consent to adoption may not be withdrawn more than thirty days after the consent is signed. The consent forms do not include any advisement of the legal effect of a signature.

[3] At the post-adoption hearing, Grandmother, Mother, and Father testified consistently that M.P.S., Jr. had resided intermittently with Grandparents.

2011, Grandparents filed a petition to accept a home study conducted by Brandy Sons, MSW ("Sons"). An Indiana Department of Child Services ("DCS") Report appears to have been attached to the adoption home evaluation.[4] No criminal history document was submitted.

On February 2, 2011, the trial court judge signed two orders: one purportedly accepting a home study regarding M.P.S., Jr.[5] and one setting the matter for a final hearing six days later, on February 8, 2011. The distribution portion of the order named only Bartanen-Blevins.

Father and Mother were planning a trip to Virginia, to transport one of Grandmother's children to Virginia to live with grandparents. The trip had been planned for February 11, 2011. On February 7, 2011, Mother heard Father and Grandmother conducting a conversation in the bathroom (the only room of the one-bedroom home with a door); she did not hear the details. Father came out and announced that the trip to Virginia would take place immediately.

On February 8, 2011, Grandparents, Bartanen-Blevins, and M.P.S., Jr. appeared in court. Bartanen-Blevins advised the trial court that M.P.S., Jr. had been with Grandparents since his birth; Grandmother testified accordingly. The trial court verbally granted the adoption. The next day, the trial court issued a written order finding that a home study

---

[4] Although it is not file-stamped and does not have an "Attachment" designation, a DCS Preliminary Report of Alleged Child Abuse or Neglect appears in the appendix with home study materials, and Sons referred to the report during her testimony. DCS substantiated abuse by Grandfather against one of his teen-aged sons. After the son was verbally disrespectful and pushed Grandfather, Grandfather choked the son and struck him, resulting in a burst eardrum.

[5] Inexplicably, the "Order Accepting Prior Home Study" recites that the purpose of the study was to determine whether the "Petitioners" in Cause No. 88C01-1012-AD-00045 were "fit and proper persons to be allowed to adopt [J.L.M.V.]" not M.P.S., Jr. (App. 30.)

regarding M.P.S., Jr. had been accepted, Grandparents had no criminal history preventing adoption, necessary consents had been given, and it was in the best interests of M.P.S., Jr. to be adopted by Grandparents.

On February 13, 2011, Mother awoke in Virginia to find Virginia Grandparents asking where Father was. Mother received a text message sometime later, informing her that Father had gone back to Indiana. Mother was stranded with no money. Suspecting that the adoption hearing had taken place, Mother contacted the office of Bartanen-Blevins and was informed that, indeed, the hearing had taken place.

On February 25, 2011, Mother filed a motion to correct error or, alternatively, a motion for relief from judgment. She submitted an affidavit wherein she averred that she had been threatened and intimidated into signing the consent. Following a hearing at which Mother, Father, Grandparents, Sons, and Bartanen-Blevins testified, the trial court denied the motions.[6] This appeal ensued.

## Discussion and Decision

Mother contends that, at a time when she was unemployed, isolated with in-laws, and unrepresented by counsel, she was coerced by threats of physical harm, divorce, and separation from her child into signing a consent form she considered revocable. She further contends that, although she had a general expectation that an adoption hearing would be held, she received no explicit notice of the hearing and was strategically removed from the State of Indiana at the time of the hearing. According to Mother, she was then abandoned and Father

---

[6] The hearing commenced on July 8, 2011 and concluded on July 20, 2011.

continued his relationship with their son, undisturbed. Mother also points to alleged procedural deficiencies: the consent forms were not notarized by a person having a current notary commission; Mother and Father were erroneously and repeatedly advised by Grandparents' counsel to consider their consents freely revocable; the adoption home study was not comprehensive and included no reference to Grandmother's minor child in the State of Virginia; and, despite a DCS report of substantiated child abuse by Grandfather, no documentation of lack of criminal history was submitted to the trial court. In addition to the concerns raised by Mother, we observe that Grandparents and their attorney falsely claimed to the trial court that the child had been in Grandparents' care since birth, and the order purportedly accepting a home study in regard to M.P.S., Jr. instead refers to another child.

In general, a trial court's decision whether to set aside a judgment under Trial Rule 60(B) is reviewed for an abuse of discretion. Munster Cmty. Hosp. v. Bernacke, 874 N.E.2d 611, 613 (Ind. Ct. App. 2007). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or is contrary to law. Id. In a challenge to an adoption proceeding, we will not disturb the ruling unless the evidence at trial leads to but one conclusion and the trial court reached the opposite conclusion. In re Adoption of M.L.L., 810 N.E.2d 1088, 1091 (Ind. Ct. App. 2004). We do not reweigh the evidence nor assess the credibility of witnesses. Id. However, we owe no deference to the trial court's legal conclusions. In re Adoption of M.M.G.C., 785 N.E.2d 267, 269 (Ind. Ct. App. 2003).

Mother has claimed that she was denied due process at each stage of the proceedings,

6

specifically, when her consent was executed, when notice of the hearing was issued, and when the final adoption hearing was conducted. We turn to our consideration of whether Mother voluntarily gave consent to the adoption and whether her parental rights were terminated in a procedurally fair setting.

Consent. Indiana Code Section 31-19-9-2 provides that a consent to adoption may be executed at any time after the birth of the child, in the presence of the court, a notary public, or an authorized agent of the DCS or a licensed child placement agency. Here, it is undisputed that the consents at issue were not signed before a notary public. Grandparents argued that their attorney functioned as an officer of the court and thus the intent of the statute was satisfied; the trial court was persuaded accordingly. We must disagree that statutory compliance may be so liberally construed in an adoption matter.

"The right to raise one's child is an essential and basic right more precious than property rights and is within the protection of the Fourteenth Amendment to the United States Constitution." Matter of Adoption of Topel, 571 N.E.2d 1295, 1298 (Ind. Ct. App. 1991). Accordingly, "Indiana's statutes governing adoptions should not be so liberally construed that safeguards erected for the preservation of family relationships are destroyed." Id. For the execution of a parent's consent to the adoption of his or her child to be valid, the consent must be a voluntary consent to termination of all parental rights. Id. at 1299 (emphasis in original). That is, it must be an act of the parent's own volition, free from duress, fraud, or consent-vitiating factors. Id. In Topel, we held that a parent may not validly consent to the termination of parental rights where that consent is conditioned upon retaining a right to

7

exercise visitation with that child.  Id.

Bartanen-Blevins testified that she had inadvertently allowed her notary commission to lapse before the consents at issue were signed.  She further testified that she had explained the consents to be "permanent in nature" but "they had the choice to take [them] back within a certain period of time."  (Tr. 18.)  She had also advised the parents "nothing was going to be final for a period of time" and "if there was [sic] any problems if anybody needs to change anything contact my office or we are going to get this filed quickly and so you can also contact the Court."  (Tr. 18.)[7]  Although "nothing specific was stated" with regard to future parenting time, it was clear that the extended family was all living together and Bartanen-Blevins' impression had been that Mother and Father were expecting to continue to have physical contact with their child, given the living arrangements.  (Tr. 40.)

The testimony of Father, Mother, and Grandmother at the post-adoption hearing reinforces Bartanen-Blevins' "impression" that the parents expected to have continued contact with their child.  In Father's case, that became a reality.  He continued to live with Grandparents and see his son on a daily basis.  With regard to Mother, Grandmother testified that she had "never denied [Mother] to see the baby" but also described difficulties with the process.[8]  (Tr. 185.)  Grandmother testified that visitation had not "been brought up" at the time of the consent execution because both Mother and Grandmother had believed that Mother would continue to reside in Grandparent's home.  (Tr. 185.)

---

[7] Grandmother's recollection of Bartanen-Blevins' advice was:  "I believe the exact words was that they [sic] told them that it could be undone until it went to court but that the sooner they did it the better."  (Tr. 184.)

[8] At the same time, Grandmother admitted that she had taken the child away from Mother and left a court-ordered visitation at McDonald's, because Mother's grandmother had insisted on participating in the visit.

In sum, the parents, grandparents, and their attorney anticipated that parental contact would survive the execution of the consents to adopt. Both parents clearly expected live-in contact, but Mother's expectation was ultimately not met; even so, at the very least, Grandparents had promised her visitation. Indeed, Grandparents' response to the motion to correct error stated that Mother was to have contact Grandparents "deemed appropriate," within "parameters established by [Grandparents]," including as conditions that the child not be removed from Indiana and not be with Mother overnight. (App. 60.)

Even if we assume that Mother's execution of the consent was not a product of threats and coercion,[9] her consent is nevertheless involuntary where she was assured it was revocable and she did not intend to relinquish contact with her child. See Topel, 571 N.E.2d at 1299 (recognizing "it is simply impossible for one to validly consent to the termination of all his parental rights, when, at the same time, he retains the right to exercise visitation privileges with the child.") Mother signed a consent predicated upon assurances that her living arrangement with her child would continue. She did not manifest an intention to permanently relinquish all her parental rights.

Home Study. Sons testified at the post-adoption hearing, freely admitting that she was not a social worker licensed to perform home studies. The parties argued at length as to whether licensure was required in the case of a grandparent adoption or whether a court order

---

[9] Mother testified that each of the Grandparents had threatened to kill her. Grandmother denied any such threat on her part; Grandfather testified that he had been joking when threatening to shoot Mother. Nonetheless, it is uncontroverted that Father had threatened to divorce Mother if she was non-compliant, that Mother lacked any independent income when she was at Grandparents' house, that she would leave the residence in the company of at least one family member, and that Father would take her car keys and put them in his pocket when he left the house without her.

9

for a home study by a non-licensed social worker sufficed.

Indiana Code Section 31-19-8-5 provides that a court may waive a home study report if a petitioner for adoption is a step-parent or grandparent and the court has waived the period of supervision. Here, there is no court order for waiver. In any event, testimony at the post-adoption hearing clearly establishes that the home study here did not adequately apprise the trial court of the totality of the relevant circumstances, so that the trial court could assess M.P.S., Jr.'s best interests.

For example, Sons testified that she had received no information with regard to one of Grandmother's children. Sons reported that Grandmother had three adult children, aged 18, 20, and 21. One son lived with his father in Virginia. However, Sons was completely unaware of the existence of Grandmother's minor child. Although Grandmother admitted at the post-adoption hearing that she had a daughter in Virginia, who had been in her father's custody since her infancy in 1998, and with whom Grandmother did not exercise regular parenting time,[10] Grandmother had not informed Sons of this. According to Sons, had she been properly informed, this would have "raised a red flag" and she would have attempted to "get the child registry from that State." (Tr. 95.)

Sons had uncovered information that Grandfather had a prior case of child abuse "substantiated" by DCS in Indiana. (App. 20.) The incident involved Grandfather choking and striking his sixteen-year-old son after the son had become verbally disrespectful and then pushed his father. Sons believed that the sixteen-year-old may have sustained a small hole in

---

[10] Grandmother had "talked to" her daughter about two months before the post-adoption hearing. (Tr. 187.)

his eardrum.

Despite the substantiation of abuse, it is unclear whether a comprehensive criminal background check was performed in accordance with Indiana Code Section 31-9-2-22.5. Sons indicated in her report that Grandparents had consented to a "local" criminal history check and "a criminal history check was done by the Indiana State Police and found no criminal involvement for [Grandparents or Parents]." (App. 20.) Sons was questioned with regard to procedures generally employed as well as specifics of the instant study. At some point, she testified "The state police check is federal. It covers the whole United States." (Tr. 94.) In context, she may have been testifying about the Grandparents' specific criminal check; however, there is no document in the record indicating the breadth of the Grandparents' criminal history check.

Thus, our review of the record reveals a lack of compliance with statutory home study procedures; indeed, the sole relevant court order refers to another child. Our review also leads us to conclude that the trial court lacked adequate information to support the factual conclusions incorporated in the adoption decree, specifically, that the home study regarding M.P.S., Jr. had been accepted, no criminal history prevented the adoption, the parents had consented to the adoption, and the adoption was in the best interests of M.P.S., Jr.

Notice and Hearing. Mother testified that she did not receive notice of the adoption hearing; Father testified that Mother did receive notice. The court's order setting the adoption hearing listed for distribution only Grandparents' attorney. We will not make a factual finding as to whether Mother received a notice separate from her in-laws, and we

11

observe that Indiana Code Section 31-19-2.5-4(1) provides that notice does not have to be given to one whose consent has been filed with the petition to adopt.

Nonetheless, we find the circumstances surrounding the final hearing relevant to an inquiry as to the voluntariness of Mother's consent. We observe that the circumstances and timing of the trip to Virginia seem highly suspect, and potentially calculated to keep Mother from attempting to withdraw consent. The pre-planned trip to deliver Grandmother's son to live with other grandparents was advanced in time such that it coincided with the hearing date, Mother was not given a reason for the change in plans, Mother was abruptly left behind in Virginia, and she then immediately (with apparent assistance from one of the Virginia Grandparents) began making efforts to gather information as to what had transpired in Indiana.

It is also noteworthy that the parents' absence at the adoption hearing allowed Grandparents' misrepresentation to the court to go unchallenged. At the February 8, 2011 adoption hearing, at which only Grandparents and their attorney appeared, counsel represented to the court that "[the child] has been with them since birth." (Tr. 3.) Grandmother testified accordingly. The transcript of the hearing is three pages in its entirety. The trial court having been advised in the petition for adoption that both parents lived at the Grandparents' address, it is not surprising that no inquiry was made as to the biological parents' acquiescence. In essence, the Grandparents painted a picture for the trial court that the parents had never independently cared for their child and Grandparents had cared for him continuously since his birth.

12

The record is replete with evidence of procedural error, involuntariness, and fraud upon the court. In light of the extremely irregular and – to some extent – fraudulent circumstances surrounding the adoption of M.P.S., Jr., we conclude that Mother has met her burden to set aside the adoption. Her consent was invalid as a matter of law. We remand to the trial court with instructions to vacate the adoption decree, and to comply with Indiana Code Section 31-14-13-1, which vests sole legal custody of a child born out of wedlock in the biological mother.

Reversed and remanded with instructions.

BAKER, J., and DARDEN, J., concur.