## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 25 2020, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Michael H. Michmerhuizen
Cathleen M. Shrader
Fort Wayne, Indiana

Shannon L. Robinson
Bloomington, Indiana

ATTORNEYS FOR APPELLEES

Justin Harrison
Bloomington, Indiana

Beth Friedman Kirk
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

K.F., et al.,

*Appellants,*

v.

B.B., et al.,

*Appellees.*

Termination:

Adoption Agency,

*Appellant,*

March 25, 2020

Court of Appeals Case No.
19A-AD-2162

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause Nos.
53C07-1905-AD-50, 53C07-1906-JT-316

v.

B.B., et al.,
*Appellees.*

**Altice, Judge.**

# Case Summary

This is a consolidated appeal of two cases that were tried together: the adoption of an infant born on June 1, 2019, and a sister case terminating the biological parents' parental rights as to the child. The appellants, K.F. and R.H., (adoptive parents) appeal the trial court's decision that invalidated B.B. (Father) and J.A.P.'s (Mother) (collectively, birth parents) consents to their child's adoption. The adoptive parents seek to set aside the judgment, claiming that their attorney should have recused himself because he was a potential witness at trial and that the birth parents failed to demonstrate that their consents to the adoption were not knowing and voluntary. Heartland Adoption Agency (Heartland) asserts that the judgment must be reversed because the evidence established that the birth parents' consents were knowing and voluntary as a matter of law and that the trial court erred in denying its motion for summary judgment.

We affirm.

# Facts and Procedural History

[3] The birth parents began a romantic relationship with each other in March 2017. At the time, Father was sixteen years old and Mother was fourteen years old. Several months later, Mother became pregnant and told her mother (Grandmother) about it. Grandmother permitted Mother to withdraw from high school and continue online study. The couple's son was born on February 10, 2018, and Mother again became pregnant in August of 2018.

[4] Mother contemplated adoption from the outset of the second pregnancy. She did not initially tell Grandmother of the pregnancy because she was concerned about her reaction. Father, however, informed his mother (Ruby) of the second pregnancy, and she suggested that the couple consider placing the child for adoption because of the couple's financial hardships.

[5] On May 16, 2019, Father contacted attorney and owner of Heartland, Don Francis, who was a close family friend, about a possible adoption. Francis had previously assisted Father's family with various legal issues over the years. When the two met, Francis handed Father a packet of adoption-related materials and forms from Heartland that included an adoption plan and various forms for Mother to sign. They also discussed Mother's emancipation possibilities. At that time, Father believed that Francis was working on the couple's behalf. Although Mother had not met Francis, she signed and dated a one-page adoption plan and a "Mother's Notice of Intent to Relinquish Parental Rights and Notice of Intent to Consent to Adoption" on May 16,

2019.  *Appellant's Appendix* at 82-84.  Mother acknowledged in the plan document that she had arranged for the child's adoption.

[6]     The birth parents met with Francis on May 21, 2019, to obtain additional information about the adoption process and Mother's emancipation.  Mother told Francis that she did not want Grandmother to know about the baby or the adoption because of concern over her reaction.  Thereafter, Grandmother signed an emancipation document that Francis had prepared.  Francis set up medical appointments for Mother throughout the pregnancy and he attended some of those appointments.  Francis also continued to advise the birth parents about the emancipation process and Medicaid eligibility, and he offered to obtain counseling for Mother.  Over a sixteen-day period, Francis had supplied the birth parents with nearly fifteen forms to complete and sign.

[7]     The adoptive parents were married on November 11, 2017, after dating for about six years.  The couple had been pursuing adoption options for some time and were certified foster parents.  The adoptive parents paid Francis a total of $41,000 to complete an adoption for them.

[8]     In late May 2019, Francis contacted them about meeting the birth parents.  Because the adoptive father was working, the adoptive mother and her sister-in-law travelled to Bloomington to meet the birth parents and their first child.  The birth parents told them that they wanted to place the baby for adoption because of financial issues and the difficulty they would have in supporting an additional family member.

[9]     On the day after Memorial Day, the adoptive parents drove to Bloomington to attend a doctor's appointment with Mother. Francis met them in the parking lot of the physician's office, and he had prepared a form entitled "Father's Consent to Termination of Parental Rights and Consent to Adoption" for Father to sign. *Transcript Vol. V, Exhibit P.* The adoptive father overheard Francis tell Father that the purpose of the document was to terminate the birth father's rights as a father. Father signed the document and acknowledged in the consent form that he was not under "undue influence, duress, or improper pressure in signing the consent; he had "carefully considered" the reasons for adoption, he was aware that once he signed, he had "no legal claim" to the child, the document was irrevocable, and he understood that attorneys Francis and Michelle Domer represented the adoptive parents and not him, and that he had the right to consult with an attorney. *Transcript Vol. I at 5, Exhibit P.* Notwithstanding these terms, Francis told Father that "they could stop [the adoption] at any time." *Transcript Vol. III at 82-83.* Francis did not advise Father about the consequences of signing the document; nor did he tell them that they could seek independent legal counsel. Father's consent form was filed with the trial court on May 29, 2019, as an attachment to the adoption petition.

[10]    Mother gave birth to the child on June 1, 2019, with Father and the adoptive parents present at the hospital. Following the delivery, the adoptive mother told Father that the baby was the birth parents' and that if they were having second thoughts about the adoption it was fine, they would not be mad, but they needed to let them know. Father could not recall all of the conversation,

but he admitted that he would not have put the adoptive parents through the process had he not intended for the adoption to proceed. At the time, no one expressed any reservations or doubts about continuing with the adoption. Several hours after the birth, however, Mother realized that it was "time to hand [the baby] over but [she] didn't want to." *Transcript Vol. II* at 135. Mother said that the nurses were telling her she was doing a really nice thing, but she "wanted somebody to tell [her] I think you should . . . think about it more." *Id.* at 136.

[11] Father contacted Francis about signing additional paperwork so the baby could leave the hospital with the adoptive parents. Francis and Domer arrived at the hospital, and the birth parents executed a consent for the child's immediate placement. Shortly thereafter, a clinical social worker, Kathryn Boeck, interviewed Mother and Father for about fifteen minutes regarding how they felt about proceeding with the adoption and whether they felt coerced. Boeck found Mother to be pleasant and alert, and Mother volunteered that she did not feel any pressure about moving forward with the adoption.

[12] The couple volunteered to Boeck that "they did not have the means to support the child in order to give [the baby] a good life," and Mother believed that the adoption was in the child's best interests. *Id.* at 250. Mother told Boeck that she thought it was the best thing for the child and she wanted to help other people. Boeck's notes recited that both birth parents "are in agreement with adoption and [the birth mother] does not feel coerced and is not under the

influence of medication that would impair her judgment." *Transcript Vol. III* at 2-3, 5.

[13] When Francis and Domer returned to the hospital room, Mother signed a "Relinquishment of Custody" and a "Consent to Termination of Parental Rights and Consent to Adoption." *Id.* at 2-5, 27. Mother agreed in writing that she was not subject to undue influence, duress, or pressure from her family or friends; that "[she consented] to the adoption of [her] baby boy born June 1, 2019;" and that she believed the adoption to be in the best interests of her baby and family; that she understood that upon execution she had no legal claim to the child and the consent was irrevocable; that the consent was permanent and could not be revoked; and that she understood Francis and Domer were not her attorneys and were attorneys for the adoptive couple. *Transcript Vol. V, Exhibit 1.* Just above her signature was language stating, "[t]his termination of parental rights and consent to adoption was executed voluntarily and knowingly. I understand this document will be filed with the court and is irrevocable." *Id.*

[14] A hospital nurse authorized the baby's discharge the following day. Prior to the release, Grandmother arrived at the hospital and realized that Mother had the baby and had authorized the adoption. Grandmother was very angry and emotional about Mother's decision to allow the adoption.

[15] The baby and the adoptive parents left the hospital together approximately thirty-seven hours after the birth. When the birth parents left the hospital,

Father attempted to contact Francis because he and Mother wanted the baby returned to them. Father believed that Francis could—and would—stop the adoption at any time. Moreover, Mother remembered Francis telling her that she had thirty days after she signed the forms to withdraw her consent, although it would be "hard and difficult." *Transcript Vol. II* at 139-42.

[16] On June 3, 2019, Father texted Francis stating, "hey don . . . we can't do it don please fix this . . . do please call me. . . ." *Transcript Vol. V* at 239. That same day, the birth parents submitted a letter to the court, seeking to withdraw their consents. Francis texted Father on June 8, indicating that he was "not mad" and that he needed to know how Mother and Father wanted to proceed. *Id.* at 241. Father responded that he wanted the adoption revoked "and custody [returned] to us." *Id.* Francis did not answer, and the trial court appointed counsel for the birth parents. Following a hearing, the trial court awarded temporary custody to the adoptive parents and set the matter for trial.

[17] Thereafter, Heartland petitioned for termination of parental rights, and Mother contested the adoption and sought to withdraw her consent. Heartland filed a motion for summary judgment, seeking a determination that the birth parents' consents were voluntary as a matter of law. Father filed an affidavit in opposition to the motion for summary judgment averring, among other things, that

> 33. I executed the Consent on May 23, 2019, because [Francis] recommended that I do so, because I thought [Mother] wanted

the adoption, and because I was concerned about supporting two children financially based on my income.

. . .

41. [Mother] and I immediately regretted that we let [the baby] leave the hospital without us.

42. I realized that [Mother] and I were not communicating to each other how much we both wanted to avoid the adoption and raise [the baby] together.

*Transcript Vol. V, Exhibit N.* The trial court denied Heartland's motion for summary judgment and the adoption and termination matters were consolidated for a two-day trial that commenced on August 15, 2019. Francis and Domer represented the adoptive parents and Heartland throughout the proceedings.

[18] Before and during the hearing, all parties were aware that Francis could be a potential witness in the case. Nonetheless, the adoptive parents did not object to Francis's representation. At one point during cross-examination, Francis challenged a statement that Mother made about what he had allegedly told her about the adoption process. There were other occasions where Francis sought to interject his comments into the record, yet the few objections regarding Francis's comments were overruled and there was no further inquiry by the parties or the trial court about a potential conflict of interest with regard to Francis.

[19] Although Francis's co-counsel was at the trial, she had not entered an appearance for the adoptive parents. Francis acknowledged to the trial court that his co-counsel would enter an appearance for the adoptive parents and "continue on" if he had "to get up as a witness." *Transcript Vol. II* at 4. As Francis was never called as a witness, he continued his representation of the adoptive parents with no objection to that representation throughout the remainder of the trial.

[20] Mother presented the testimony of Peter Finn, a professor in Indiana University's Department of Psychological and Brain Sciences. Dr. Finn was qualified as an expert regarding an individual's decision-making process from early adolescence through middle adulthood. Dr. Finn testified that adolescents are more impulsive than adults and are sensitive to "social evaluation" by others. *Id.* at 181-82.

[21] Dr. Finn had interviewed Mother prior to trial and found the following factors germane to the issue of Mother's consent: emancipation, ambivalence, and Mother's belief that Francis was assisting her throughout her pregnancy and the adoption process. Dr. Finn also testified that Mother was likely pressured and was susceptible to undue influence from Grandmother concerning her placing the child for adoption.

[22] Following the hearing, the trial court issued an order on September 16, 2019, denying both the adoption and termination of parental rights petitions. The

trial court's findings of fact and conclusions of law provided in relevant part that

> 8. [The birth parents] were ignorant of the full import and consequences of signing the consents for adoption. They did not understand that the consents, once signed, were irrevocable and final. [The birth parents] both believed that Mr. Francis was their attorney. They believed he was acting on their behalf and protecting their interests. Based on statements by Mr. Francis, both believed at the time of signing that the adoption could be stopped prior to filing. . . .

> 9. [The birth parents] both testified that Mr. Francis created the impression that he was their attorney and was representing them in the adoption. Mr. Francis was a long time, trusted friend of [Father's] mother and father. He was the best man in [Father's] father's wedding. [Father] had known him all his life. [Francis] drafted an Agreed Entry of Emancipation for [Mother]. He offered to guide [the birth parents] through the adoption process. Crucially, he never told them that he was not representing them and that he was representing the potential adoptive parents.

> 10. Through his actions, Mr. Francis created and confirmed the false impression that he was acting as the attorney for [the birth parents]. He failed to adequately disclose the fact that he was representing [the adoptive parents] to the [birth parents].

> 11. When [Father] handed his signed consent to Mr. Francis on May 23, 2019, he was under the impression that he was providing this document to his own attorney, not delivering an irrevocable Consent to adoption to opposing counsel. After [Father] signed the Consent, Mr. Francis told [Father] that if he wanted to withdraw his consent, he should let Mr. Francis know.

12. [Mother] believed that Mr. Francis was her attorney until the day following the birth of the Baby. She first learned that he might not be her attorney when Mr. Francis was about to arrive at the hospital with the Consent for adoption. [Mother] heard a nurse say 'the other people's lawyer is going to be here soon.' At that time, [Mother] had no opportunity to speak with counsel of her own choosing. Mr. Francis did not offer to help her obtain counsel.

13. [I]n the circumstances presented in this case, it is clear that [Mother] should have been informed of her right to speak with an attorney representing her interests. Mr. Francis was aware that [Mother] was only 16 years of age. She was the victim of domestic violence. She had been effectively abandoned by her mother. She quit school in her sophomore year. That she did not adequately read a four-page legal document without having that document explained to her is hardly surprising. Mr. Francis did not attempt to review the document with her or discuss its contents. Mr. Francis did not offer to aid [Mother] in obtaining an attorney. Indeed, he never told her that he was not representing her.

. . .

16. Mr. Francis was aware that [Father] saw him as a trusted family adviser. When Mr. Francis told [Father] that he could help them, it was reasonable for [the birth parents] to infer that he would be representing them in the adoption. Mr. Francis did not read or discuss the consent documents with [Father] or [Mother] prior to execution of the documents.

17. Prior to [Mother] signing the Consent, Mr. Francis told [Mother] that she would have 30 days to think about it, but it would be hard to get the child back. [Mother] relied on this assertion in making her decision to sign the consent. She

believed that she had 30 days to consider her decision and to withdraw her consent. She also believed that if the paperwork was still in Mr. Francis' possession, the adoption had not been completed.

18. Mr. Francis' statement was not an accurate reflection of the true burden that [Mother] would bear in attempting to withdraw her consent. . . . [T]he person seeking to withdraw the consent bears the burden of proof by clear and convincing evidence. IC 31-19-10-0.5 and 1C 31-19-10-6. Withdrawal of consent is not simply 'difficult.' Withdrawal of consent would include a hearing at which [Mother] would be forced to prove by clear and convincing evidence, the Baby should be returned to her. An attorney acting in [Mother's] interests would not present this alternative to her as Mr. Francis presented it.

19. Considering her age, the circumstances, and Mr. Francis' assertion that she had 30 days to withdraw her consent, it is not surprising that [Mother] did not read the document in full.

20. On May 23, 2019, Mr. Francis handed the Consent to [Father] without explanation during [Mother's] prenatal visit to the doctor. . . . Mr. Francis did not have the expectation that [Father] had fully read and understood the document he was signing. After [Father] had signed the document, and before the birth of the Baby, Mr. Francis told [Father] just to tell him if [Father] wanted to withdraw his consent.

21. Based on Mr. Francis' statements, [Father] believed that Mr. Francis was his attorney and would not file the adoption if instructed not to do so. Beginning on the evening of June 2, 2019, [Father] made frantic attempts to contact Mr. Francis to prevent him from filing the adoption.

. . .

24. Given the totality of the circumstances, it is clear that [the birth parents] did not make informed, voluntary decisions to consent to the adoption of their child. [The birth parents] have proven, by clear and convincing evidence, that their consents were not voluntary. Therefore, the Consents to adoption are invalid.

. . .

The consents executed by [Father] to the termination of the parent-child relationship with [the baby] are not voluntary and are invalid.

. . .

3. Mr. Francis told [Father] that if [Father] wished to withdraw his consent, he should just let Mr. Francis know. This statement was made after [Father] had signed the Consent to terminate his parental rights. IC 31-35-1-6(c)(4) provides that consent to the termination of the parent-child relationship is not required if the child's biological father consents to the termination of the parent-child relationship before the birth of the child if the consent meets certain requirements. The statute further states that a child's father who consents to the termination of the parent-child relationship under this section may not challenge or contest the child's adoption or termination of the parent-child relationship. Mr. Francis' statement to [Father] was not an accurate statement of the applicable law and was made when [Father] believed that Mr. Francis was his attorney.

[23] *Appellant's Appendix Vol. II* at 24-37. The trial court ordered the baby returned to Mother by late afternoon on September 23, 2019. The adoptive parents and Heartland filed notices of appeal, and on September 19, 2019, our motions

panel granted a stay of the trial court's order requiring the adoptive parents to return the child to the birth parents. This appeal ensues.

# Discussion and Decision

## I. The Adoptive Parents' Contentions—Legal Representation

[24] The adoptive parents first contend that the judgment must be set aside because the trial court erred in permitting Francis, who was a potential and material witness at trial, to continue to represent them as their attorney. The adoptive parents assert that the trial court was obligated to order a mistrial *sua sponte*. Thus, the adoptive parents claim that they did not receive a fair trial.

[25] We initially observe that the adoptive parents did not object to Francis's representation at any time before or during trial. Thus, the issue is waived. *Indiana Bureau of Motor Vehicles v. Gurtner*, 27 N.E.3d 306, 311 (Ind. Ct. App. 2015) (holding that the general rule is that an argument or issue presented for the first time on appeal is waived for the purposes of appellate review).

[26] Waiver notwithstanding, we note that the adoptive parents' argument is premised on Ind. Professional Conduct Rule 3.7, which provides:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
>> (1) the testimony relates to an uncontested issue;
>>
>> (2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

[27] In the circumstances here, Francis was never a witness, never sought to be called as a witness, and no one attempted to disqualify him as a witness. Moreover, five attorneys and the trial judge were aware of a potential concern regarding the need for Francis's testimony months before the trial commenced. No objection was made regarding Francis's continued representation of the adoptive parents. The trial court could not have determined whether any testimony that Francis might have provided related to an uncontested issue under Prof. Cond. R. 3.7(a)(1), because none was ever offered. That said, the importance of any testimony that Francis might have offered is unclear and only speculative.

[28] Finally, we note that in family law matters, a fair trial generally requires "notice, an opportunity to be heard, and an opportunity to confront witnesses." *See D.G. v. S.G.*, 82 N.E.3d 342, 347 (Ind. Ct. App. 2017), *trans. denied*. Additionally, the trial court is afforded wide discretion in determining whether a violation of the Rules of Professional Conduct is so improper that a trial is rendered unfair. *Jackson v. Russell,* 498 N.E.2d 22, 32 (Ind. Ct. App. 1983), *trans. denied*. Contrary to the adoptive parents' contention that they were denied a fair trial, it is clear that they were able to confront adverse witnesses,

present evidence, and advance arguments at trial. Francis indicated to the trial court that Heartland's counsel would assume the representation of the adoptive parents if Francis needed to testify. Moreover, Heartland's counsel vigorously cross-examined the birth parents and other witnesses.

[29] The adoptive parents were not denied legal counsel of their choice, and they have failed to show that the absence of any testimony by Francis had any bearing on the fairness of their trial. In short, the adoptive parents have failed to show that Francis's continued representation prejudiced them in any way. For all these reasons, the adoptive parents' claim fails.

### III. Heartland's Claim; Summary Judgment

[30] Heartland argues that the trial court erred in denying its motion for summary judgment with regard to Father's termination of parental rights. Heartland maintains that the designated evidence established as a matter of law that Father executed an irrevocable consent to the termination of the parent-child relationship, and that Father's consent to the adoption "spoke for itself." *Appellant's Brief* at 28.

[31] When reviewing a grant or denial of summary judgment, we stand in the shoes of the trial court. *Murray v. Indianapolis Pub. Sch.,* 128 N.E.3d 450, 452 (Ind. 2019). We ask whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Goodwin v. Yeakle's Sports Bar and Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016). We consider only those materials properly designated pursuant to Ind. Trial Rule 56 and construe

all factual inferences and resolve all doubts in favor of the non-moving party. *Young v. Hood's Gardens, Inc.* 24 N.E.3d 421, 424 (Ind. 2015). A trial court's grant of summary judgment is clothed with a presumption of validity, and the party who lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *Id.* This court will affirm upon any theory or basis supported by the designated evidence. *Poiry v. City of New Haven*, 113 N.E.3d 1236, 1239-40 (Ind. Ct. App. 2018).

[32] In response to Heartland's motion for summary judgment, Father averred in his affidavit that

> --[T]here were a number of instances where Francis served as a trusted advisor for Father and his family;
>
> --Father did not seek assistance of independent counsel due to Francis's influence;
>
> --he was not aware of any potential conflicts of interest that Francis might have been subjected;
>
> --he did not fully understand the consent forms he signed;
>
> --he did not understand that when he signed the documents he was given by Francis, that there would be nothing he could do from that point forward to avoid the adoption;
>
> --he signed the consent form because Francis recommended that he do so because he believed that Mother wanted him to do so, and because he was concerned about providing for two children.

*Transcript Vol. V* at 15-18.

[33] A facially valid consent to the termination of parental rights is not effective if the execution of the consent was not provided voluntarily. *In re M.R.,* 728 N.E.2d 204, 209 (Ind. Ct. App. 2000), *trans. denied.* In this case, while Heartland maintains that Father's affidavit eliminates any questions of fact regarding his motivation for consenting to the termination of his parental rights, the averments reflect otherwise. Father's affidavit creates genuine issues of material fact as to whether Father's execution of the consent forms were voluntary or whether they were executed as a result of undue influence, misunderstandings regarding Francis's role in the case, or mistakes of fact as to the effect of the alleged consent. When viewed in the light most favorable to Father, the designated evidence indicates that there were genuine issues of fact regarding the voluntariness of Father's consent to the termination of his parental rights, as well as his consent to the adoption. As a result, the trial court properly denied Heartland's motion for summary judgment.

## IV. The Birth Parents' Consents and Termination of Parental Rights

[34] The adoptive parents and Heartland both argue that the trial court erred in determining that the birth parents' consents and Father's termination of parental rights were not voluntary and that its conclusion was not supported by the evidence presented at trial.

[35] In general, when a trial court enters findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A) as it did here, we employ a two-tiered standard

of review. First, we determine whether the evidence supports the findings and then we will determine whether the findings support the judgment. *In re Adoption of H.N.P.G.,* 878 N.E.2d 900, 903-904 (Ind. Ct. App. 2008), *trans. denied.* We will not set aside the findings or the judgment unless they are clearly erroneous. *Id.* Findings of fact are clearly erroneous if the record is devoid of any evidence or reasonable inferences to support them, while a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *Id.* Additionally, we will not reweigh the evidence but instead will examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom to determine whether sufficient evidence exists to sustain the decision. *Id.*

[36] In addressing the appellants' contentions, we note that the Adoption Code is construed strictly in favor of the rights of biological parents. *In re Adoption of A.S.*, 912 N.E.2d 840, 848 (Ind. Ct. App. 2009), *trans. denied*. That said, Ind. Code § 31-19-9-2(a) sets forth the requirements for the valid execution of a consent to adoption after the birth of a child. The statute provides that "consent to adoption may be executed at any time after the birth of the child, either in the presence of: (1) the court; (2) a notary public or other person authorized to take acknowledgements; or (3) an authorized agent of (A) the department; or (B) a licensed child placing agency." Additionally, for consent to adoption to be valid, the consent must be a "voluntary consent to termination of all parental rights." *In re Adoption of M.P.S.*, 963 N.E.2d 625, 629 (Ind. Ct. App. 2012). It must be "an act of the parent's own volition, free

from duress, fraud, or other consent-vitiating factors," consent must be made with "knowledge of the essential facts." *Bell v. A.R.H*, 654 N.E.2d 29, 32 (Ind. Ct. App. 1995). A consent to adoption may be withdrawn not later than thirty days after the consent to adoption is signed if: 1) the court finds, after notice and opportunity to be heard afforded to the petitioner for adoption, the person seeking the withdrawal is acting in the best interest of the person sought to be adopted; and 2) the court orders the withdrawal. I.C. § 31-19-10-3(a). The person seeking to withdraw the consent bears the burden of proof by clear and convincing evidence. I.C. § 31-19-10-0.5 and –6. We will not disturb the ruling in an adoption case unless the evidence leads to only one conclusion and the probate court reached an opposite conclusion. *In re Adoption of H.N.P.G.,* 878 N.E.2d at 903.

[37] A companion statute, Ind. Code § 31-35-1-6, sets forth the requirements for the valid execution of a consent to voluntary termination of parental rights:

> (a) Except as provided in subsection (c), the parents must give their consent in open court unless the court makes findings of fact upon the record that:

>> (1) the parents gave their consent in writing before a person authorized by law to take acknowledgments; and (2) the parents were: (A) advised in accordance with section 12 of this chapter; and (B) advised that if they choose to appear in open court, the only issue before the court is whether their consent was voluntary.

> (b) If:

> (1) the court finds the conditions under subsection (a)(1) and (a)(2) have been met; and

> (2) a parent appears in open court; a court may consider only the issue of whether the parent's consent was voluntary.

[38] In support of the claim that the birth parents executed valid and irrevocable consents, Heartland and the adoptive parents rely on *Bell*, where the mother petitioned to withdraw her consents to the adoption of her four children. 654 N.E.2d at 31. The trial court denied the petition, and she appealed, claiming that her consent had not been voluntary. *Id.* at 32. A panel of this court affirmed, finding that the evidence did not lead unerringly to a conclusion opposite the one that the trial court had reached. The evidence revealed that the adoption case worker specifically informed the mother that her adoption consents would be final. *Id.* at 33. Moreover, the mother, who was twenty-seven-years old waited nearly seven months to contest the adoption. *Id.*

[39] Apart from the fact that the instant case is an appeal from an adverse judgment, the circumstances here differ substantially from those in *Bell*. The evidence in this case established that near the end of Mother's pregnancy, Father consulted with his mother and informed her for the first time that Mother was pregnant. His mother directed him to talk with Francis, who was a long-time family friend who had provided a variety of legal services to Father's family through the years.

[40]     Francis offered assistance to the birth parents and immediately gave the birth parents various documents to sign that would begin the adoption process. Frances handed them nearly fifteen different documents to sign over a sixteen-day period leading up to the child's birth. When Francis presented Father with the consent form, Father believed that he could withdraw his consent in light of the assurances that Francis had given him. Although Father signed the consent form, Francis did not advise him of the consequences of executing that document.

[41]     Francis consistently provided advice to the birth parents about the adoption procedure and offered to arrange for financial assistance for them. Francis scheduled medical appointments for Mother, accompanied her to several of them, and instructed the birth parents about becoming eligible for Medicaid. Francis advised the birth parents about achieving emancipation for Mother, and he drafted an agreed entry of emancipation. Francis also arranged meetings between the adoptive and birth parents and instructed Father about how to act while he was in those meetings, including a text that stated "[d]on't be afraid to let them take you to dinner or go play in the park." *Transcript Vol. V* at 232. He encouraged Mother to invite K.F. to her medical appointments and offered to arrange counseling sessions for Mother.

[42]     Although Francis's representation of the adoptive parents was stated on the consent forms, he did not provide any explanation of the consequences of that representation to the birth parents. Moreover, Francis never told the birth parents that they could or should consult with independent legal counsel. The

birth parents believed throughout the adoption process that Francis was representing them.

[43] Francis also misadvised Father that if he "wanted to stop [the adoption] at any time, we could." *Transcript Vol. III* at 83. Mother testified that Francis told her and Father that "we could get him back, but it would just be hard and difficult to get him back." *Transcript Vol. II* at 139. The birth parents consistently relied on Francis to instruct them about what to do and how to proceed during the adoption proceedings. Rather than directing Father to an attorney who could advise Father about all available options, Francis steered the birth parents toward adoption. Francis's relationship with Father's family rendered him particularly influential.

[44] The evidence further established that when Mother signed the consent forms and other documents at the hospital, she "felt pressured and just wanted to stop feeling that way." *Id.* at 142. Mother also felt that "everyone was . . . on the opposite side of [her]." *Transcript Vol. III* at 47. Additionally, Father's actions after the child was born demonstrate that he did not understand the ramifications of his signatures on the forms because he believed that Francis could stop the adoption.

[45] Dr. Finn testified at trial that adolescents are more susceptible to undue influence by those who may be viewed as influential, powerful, or in a position of authority. The hospital nurses and attorneys were authority figures, and

Mother reasonably believed that they did not want her to disappoint the adoptive parents.

[46] We also reject the adoptive parents' reliance on *Matter of Adoption of Hewitt*, 396 N.E.2d 938 (Ind. Ct. App. 1979), where we affirmed the trial court's denial of an eighteen-year-old mother's petition to withdraw her consent. The birth mother in *Hewitt* executed a consent two days after her baby was born and sought to withdraw that consent ten days later. *Id.* at 939. Mother claimed that her consent was involuntary because she had been shamed by her family and had received the wrong advice from her obstetrician about her ability to change her mind about the adoption. *Id.* at 942.

[47] In affirming the trial court, we determined that the biological mother "failed in her burden to establish that the evidence at trial led to but one conclusion and the court reached the opposite conclusion," noting the high burden that must be overcome on appeal. *Id.* Additionally, the biological mother did not claim that she was ignorant of the import and/or consequences of her execution of the consent. To the contrary, the evidence established that the biological mother was advised on two separate occasions of the consequences of the consent and the rights that she was relinquishing by consenting to the adoption. *Id.* Also, unlike the birth mother here, who was sixteen years with a limited education, the birth mother in *Hewitt* was an eighteen-year-old adult who graduated from high school with a "B" average. Moreover, there was no suggestion in *Hewitt* that the adoptive parents' legal counsel had any pre-existing relationship with

the biological parents, or that there was any issue about who the attorney was representing.

[48] Unlike *Bell* and *Hewitt,* we find this court's opinion in *In re Adoption of M.P.S., Jr.,* 963 N.E.2d 625, 630 (Ind. Ct. App. 2012) instructive. In *M.P.S.*, a panel of this court found that a birth mother's signed consent to an adoption without knowledge of the essential facts was not voluntary. *M.P.S.* involved a mother who executed a consent under the mistaken belief that it could later be revoked. *Id.* at 629-30. Mother signed the consent in the presence of the adopting party's attorney, who informed her that consent was "permanent in nature" but that the parents could "take them back within a certain period of time." *Id.* at 629. The attorney also explained that "nothing was going to be final for a period of time" and "if there was any problems if anybody needs to change anything contact my office or we are going to get this filed quickly and so you can also contact the court." *Id.*

[49] Based in part on these erroneous legal statements by counsel, the birth mother challenged the voluntariness of her consent. *Id.* at 626. The trial court denied her request. *Id.* We reversed the trial court, finding that the birth mother did not act "voluntarily" and her alleged consent to the adoption was invalid. *Id.* at 632. We observed that "[e]ven if we assume that Mother's execution of the consent was not a product of threats and coercion, her consent is nevertheless involuntary where she was assured it was revocable and she did not intend to relinquish contact with her child." *Id.*

[50] Here, it was reasonable for the trial court to conclude that the birth parents' consents in this case were not voluntary, as they both lacked critical and necessary facts that pertained to the impending adoption. Moreover, the evidence of overreach is readily apparent in light of the birth parents' ages, backgrounds, and financial difficulties. Given these circumstances, we cannot say that the evidence led unerringly to a conclusion opposite of what the trial court reached. Thus, we decline to disturb the trial court's judgment.

[51] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.